Kenneth Dee STOGSDILL, Appellant,

v.

The STATE of Texas, Appellee.

No. 54781.

Court of Criminal Appeals of Texas.

June 22, 1977.

Thomas W. Schueller, Wichita Falls, for appellant.

Timothy D. Eyssen, Dist. Atty. and Roger E. Towery, Asst. Dist. Atty., Wichita Falls, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for capital murder. Punishment was assessed at death.

Appellant contends that the court erred "in holding evidence to be sufficient to sustain conviction, when circumstances amounted to 'strong suspicion' and 'mere probability' of Appellant's participation in the offense charged."

The indictment upon which the prosecution was based charged in pertinent part that appellant "on or about the 14th day of April A.D. 1975" did then and there

"intentionally cause the death of Billy Ed Price by beating him and stabbing him with a lug wrench, and that the said Kenneth Dee Stogsdill was then and there in the course of committing and attempting to commit robbery of the said Billy Ed Price. . . ."

The challenge to the sufficiency of the evidence necessarily requires a detailed review of the evidence.

The record reflects that Billy Ed Price was last seen alive on the morning of April 14, 1975, by his brother-in-law, Al Furr, when Furr left Price at the Continental Bus Station in Dallas. Furr testified that Price had over a hundred dollars on his person. On the morning of the next day, April 15, 1975, Jerry Smith and two co-workers were dispatched to an oil lease south of Burkburnett for the purpose of repairing a salt water leak. In traveling to the lease, Smith and his companions crossed a wooden bridge which was in a state of disrepair as the result of loose boards. After completing their task at the oil lease, Smith and his companions stopped at the bridge to "straighten up the boards" in order that further inconvenience might be avoided in crossing the bridge. In the course of doing the necessary repair work, a body was discovered under the bridge. Law enforcement officers were immediately notified. Investigation revealed that the body under the bridge was nude, beaten, stabbed and sexually mutilated. The body was later identified at the morgue in Wichita Falls by Mr. and Mrs. Al Furr as being that of Mrs. Furr's brother, Billy Ed Price.

Dr. Donald Fletcher, a pathologist, performed an autopsy on the body of the deceased at 3:00 p. m. on April 15, 1975. Dr. Fletcher testified as to numerous lacerations and bruises of the body which included a badly beaten head resulting in an egg-shell fracture. Stab-like perforations resulted in two punctures of the heart, tears and puncture of the lungs, pancreas and stomach. A puncture wound in the scrotal area resulted in a penetration of the large and small bowels. The male reproductive organs had been removed by "a very fine, knifelike cut." In response to a question as to the cause of death, Dr. Fletcher stated, " . . . there are several possibilities, but the most likely would be the perforation and tearing of the heart. That would lead to a very rapid death."

Dr. Fletcher's reply to the question of whether the wounds which resulted in death could have been caused by being stabbed with a lug wrench was, "That

would be an excellent tool to do what was done." When asked if he had an opinion as to whether the deceased was clothed or nude at the time the wounds were inflicted, Dr. Fletcher answered, "I would think it would be rather difficult to predict. . . My opinion would be that the body was nude." The autopsy revealed a high content of alcohol and barbiturates in the body, leading Dr. Fletcher to conclude, "My opinion is that had he [deceased] not—any person with that level of drugs in his system, in his blood, untreated would die, without any further injuries."

Dean Bohannon, a former employee of the Vernon Police Department, and his wife were walking along the Pease River in Wilbarger County on April 15, 1975, when they "spotted a suitcase and some clothing floating in the river." Bohannon was able to recover the items and took them to the Vernon Police Department. The following day, an investigation of this area of the river resulted in the recovery of clothing and a lug wrench.

A few days later, Deputy Sheriff King of Wilbarger County found a social security card with the name Billy Ed Price on it and some photographs under a bridge on a farm to market road about one and a half miles north of the Pease River bridge.

While en route from Chillicothe to Vernon sometime during April, 1975, Wilburn Hendry at a point "approximately seven miles" north of Vernon observed a boot laying just off the shoulder of the road, "and possibly fifty, maybe seventy-five yards further down the road I noticed another one." Hendry retrieved the boots and turned them over to the Wilbarger County Sheriff's Department. Deputy Sheriff Russell, along with Hendry, returned to the location where the boots were found and a search of the area resulted in the recovery of a leather dress glove.

The Furrs identified the boots, the glove, and some of the items of clothing found in Wilbarger County as having belonged to the deceased.

William Kump testified that sometime during the harvest season of 1975 appellant picked him up at about 8:00 p. m. when he was "hitchhiking" a ride to his motel. According to Kump, they rode around for an hour or two until they stopped at a "roadside park place." Kump and appellant stayed at this location until "4:30 or 5:00, maybe a little later" the next morning. Kump stated that prior to the time they left this location appellant told him that "he wanted to cut my dick and balls off with a pocket knife—he wanted to make a woman out of me." Appellant took Kump to his motel and asked him not "to tell anybody about anything that happened, what was said there." The record reflects that these events transpired in and around Vernon.

Steven Laney, a transient, testified he met appellant in the Office Lounge in Wichita Falls on July 21, 1975, around "7:30 or 8:00 o'clock" in the evening after he, Laney, had been drinking beer since noon, that he and appellant later went to another bar and, after leaving the second bar, they "bought some beer and went out towards somewhere south of town." They stopped at a roadside park where additional beer was consumed and Laney "blacked out." The only thing Laney remembered after this point was " . . . being struck from around the right-hand to the rear side with an object." Later Laney was aware of " . . . crawling to the highway through kind of a swamp-like thing, through about two feet of water." The first time Laney "came to after blacking out" was after he had been struck with an object. In response to the question, "Who struck you?" Laney responded, "Mr. Stogsdill [appellant], I believe." Laney stated that he saw appellant and he had "more or less a mad expression." Laney further testified that he did not recall appellant making any advances toward him and although he received severe injuries to his body he did not believe his sexual organs had been "tampered with." John Gibbs, physical director of the Wichita Falls YMCA, saw Laney sitting beside the road a mile or two outside of Henrietta on July 22, 1975. Gibbs related that Laney was clad in one black sock and the most serious of his mul-

tiple injuries appeared to be an injury to his skull. Prior to the admission of Laney's testimony, a hearing was held outside the presence of the jury on appellant's motion to suppress the testimony of Laney on the basis that same was inadmissible as an extraneous offense. At the conclusion of the hearing, the court found same to be admissible. Upon the return of the jury, the court instructed the jury that evidence of the extraneous offense was admitted only on the issue of identity. The court's action in admitting the extraneous offenses gives rise to the only other ground of error advanced by appellant, which we find unnecessary to discuss in light of our disposition of appellant's contention relative to the sufficiency of the evidence.

While the State does not point to what circumstances connect appellant with the crime in its brief, it would appear from a review of the record that the prosecution relies on a comparison of casts of tire tracks at the scene and two tires taken from a pickup truck sold by appellant to Edward Lee Thomas on April 28, 1975, and the comparison of known hair of the deceased and hairs which were picked up with a vacuum cleaner used on the interior of said truck on August 12, 1975.

Deputy Inglish of the Wichita County Sheriff's Department took the two tires taken from the pickup (the only two tires which still remained on the vehicle that were on same when appellant traded the pickup on April 28), along with the casts made of tire tracks at the scene of the murder, to the Department of Public Safety Lab in Garland on August 13, 1975.

Terry Crone, a chemist for the Department of Public Safety in Garland, testified regarding the comparison of the tires and casts made of tracks at the scene. The report which he identified as having been given by his office to Wichita County authorities appears to fairly summarize his testimony. It reads in pertinent part:

"On August the 13th, 1975, you personally submitted two Firestone tires and two plaster casts of tire tracks. It was requested that examination be made to determine whether or not either of the submitted tires made either or both of the impressions from which the plaster casts were made. We have completed our examinations and wish to report that both of the tires exhibit a tread design similar to that shown by one of the plaster casts. However, the plaster casts do not show enough detail to identify either of these tires as having made the impressions from which the cast was taken. . . ."

On redirect examination, Crone was asked, "But you're not saying that one of those tires did not make that impression either, are you?" and the witness answered, "That is correct, it's possible it could have made it." On recross, Crone testified that the cast was made by some tire of the same type of tread, of the same tread design and the same size, but he could not say that the tires in question made it.

Deputy Inglish testified that he took the measurements of the track and wheel base of the pickup appellant sold Thomas and found same to be "almost identical" to the measurements of tracks of an unknown vehicle at the murder scene. On cross examination, Inglish stated that he presumed that this would be the same measurement on any hundred and fourteen inch wheel base vehicle.

John Hippard, a special agent assigned to the F.B.I. laboratory in Washington, D. C., testified that the nature of his work with the F.B.I. was conducting "microscopic examinations and comparisons of hairs, fibers and related materials." After examining microscopically known hairs from the head of the deceased and two hairs taken from "debris from the pickup," Hippard concluded they were microscopically alike and explained "whenever they are microscopically alike then my conclusion is that they could have come from the same source." Hippard's examination of the lug wrench or tire tool revealed that known body hairs of the deceased were "microscopically like" those on the tire tool, "and accordingly my conclusion would be that they could have come from the same source." In response

to a question on cross examination, Hippard stated that portion of his written report relative to his examination was correct which stated, " . . . hairs do not possess enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others."

Dr. Irving C. Stone, Chief of the Physical Evidence Section at the Institute of Forensic Sciences in Dallas, testified that known body hair taken from the deceased and hair found on the tire tool "could have come" from the same source. With respect to his comparison of known head hairs of the victim and hairs taken from the debris of the pickup, Dr. Stone concluded, "Everything I saw in the one set of hairs were identical in all characteristics to the other set." In response to the prosecutor's question, "Could you say how conclusive that is as to them coming from the same head?" Dr. Stone responded:

"It's my experience you cannot positively associate a hair or set of hairs exclusively to a person to the exclusion of all other people in the world, but after you've looked at hairs for a number of years and you have an experience factor, you come to see that it is easy to differentiate—I can say positively that this hair could not have come from somebody—but once you've got two hairs that are the same in all observable characteristics and you've concluded that they might have come from the same person, what you're saying in essence is that it's highly unlikely it came from anybody else other than this person, but you're still not saying conclusively, positively, that this hair is that person's. . . . "

On cross examination, Dr. Stone agreed that a definite identification of hair cannot be made, "since there's a possibility of more than one source of that hair."

Dr. John Randall, Director of the Nuclear Science Center at Texas A & M University, testified that he made a neutron activation analysis of known head hair samples of the deceased and three hairs Dr. Stone selected from the debris taken from the pickup as having compared extremely well with the known head hairs of the victim. Dr. Randall related that in using this procedure, " . . . we're looking to find the trace minerals that are contained within the hair, and this we do and then we compare the distribution of minerals. We look at which ones we find, we look at how much we find, and then compare this between two hair samples. The object ultimately is to come up with some answer as to do these two hairs come from the same origin, that's the reason of interest for the forensic application."

Dr. Randall stated that he observed sodium, bromide, manganese, copper, aluminum, zinc and gold, and:

"Based on the analysis I found that six of the elements compared favorably for us to say they came from the same source, they compared favorably within the limits of the experiment. One element, the sodium, did not compare. In fact, looking at the ratio, the sample that was identified as the suspect [sic], all of those hairs had an amount of sodium four times greater than that which came from the pickup."

Disregarding the discrepancy in the sodium element, Dr. Randall concluded that the probability of the match of the known head hair and the hairs found in the debris of the truck "is twenty-five thousand to one." Dr. Randall suspected that the known hair from the victim had been contaminated by salt because "I have been informed that the victim's head was immersed in a very salty stream, a stream that discharged salt waste." Dr. Randall further testified regarding the variance in the sodium content:

"My opinion was that there are two plausible explanations; that is one of the two plausible explanations. The other is that these two samples came from different people. Now, yes, to explain away the sodium contamination is necessary for me to say I feel there is a greater probability that this is contaminated samples from the same individual."

Dr. Randall further stated that if he had been able to make an "aluminum compari-

son . . . and I had an excellent comparison with aluminum," the twenty-five thousand to one ratio would be much larger.

In conclusion, Dr. Randall testified if he had been able "to use the aluminum . . and if the sodium had agreed, I would expect that the probability would be five hundred thousand to one."

Appellant points to State's Exhibit 41, which was identified as a picture "of the body itself beneath the bridge after some of the timbers had been removed," which shows the head of the victim lying on the framework of the bridge clearly out of the water. State's Exhibit 43 was identified by Officer Inglish as being a picture depicting the bridge and the body "as it was when we arrived." Although this picture is taken from a different angle, the head of the victim appears to be in the same position shown in Exhibit 41. Appellant further points to an absence of testimony relative to there being any salt water in the creek to contaminate the head hairs of the victim. The State responds by pointing to testimony of one of the men who discovered the body who testified on direct as follows:

"Q. And is this a creek or ditch or what that this bridge is over?

"A. There's a creek goes through there, never water in it unless it rains.

"Q. Does any salt water from some of the separators ever get in this creek?

"A. Yes, sir, occasionally they do."

Appellant did not testify, nor did he offer any evidence in his defense.

There being no direct evidence to connect appellant with the crime, the court properly instructed the jury on the law of circumstantial evidence.

In assessing the sufficiency of the evidence, we will assume arguendo that the evidence of the extraneous offense arising out of the injuries inflicted on one Steven Laney was admissible.[1]

---

1. It appears that the trial court admitted the extraneous offense in question on the basis that the issue of identity was raised by cross-examination of State's witnesses. In the event of re-trial, we call attention to our decisions in

Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction. *Baker v. State*, Tex.Cr.App., 447 S.W.2d 172; *Moore v. State*, Tex.Cr.App., 532 S.W.2d 333; *Higgins v. State*, Tex.Cr.App., 515 S.W.2d 268; *Indo v. State*, Tex.Cr.App., 502 S.W.2d 166. The rule has long been that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting to only a strong suspicion or mere probability is insufficient. *Indo v. State*, supra; *Easley v. State*, Tex.Cr.App., 529 S.W.2d 522; *Culmore v. State*, Tex.Cr. App., 447 S.W.2d 915. In a very recent case, *Flores v. State*, 551 S.W.2d 364 (1977), where circumstantial evidence was relied on for conviction, this Court pointed out that it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.

In *Flores*, the defendant was charged with capital murder under V.T.C.A., Penal Code, Sec. 19.03, the indictment, like the one in the instant case, alleging that the murder occurred " . . . in the course of committing and attempting to commit robbery. . . ." Unlike the instant case, the court in *Flores* submitted murder (V.T.C.A., Penal Code, Sec. 19.02) in its charge rather than capital murder, thereby relieving the State of the burden of proving that the defendant committed the murder while " . . . in the course of committing and attempting to commit robbery. . . . " Under evidence more persuasive of the accused's guilt than we find in the instant case, this Court in *Flores* found the evidence insufficient to support the conviction.

*Redd v. State*, Tex.Cr.App., 522 S.W.2d 890; *Caldwell v. State*, Tex.Cr.App., 477 S.W.2d 877; *Hickombottom v. State*, Tex.Cr.App., 486 S.W.2d 951, which address the law in this area.

As was the case in *Flores*, appellant was not placed in company of the deceased. In *Flores* the defendant was shown to have been in possession of the deceased's car about twenty-four hours after the deceased was last seen alive. About six weeks later defendant was still in possession of the deceased's car, at which time the vehicle bore license plates issued to another car. Clothing and other items belonging to the deceased were found in a suitcase in a car trunk where they had been left by defendant and a companion. Bloodstains were found on the seat of the car and on defendant's shirt. While the stains did not respond to typing procedures, it was determined that the stains were of human blood.

In *Flores*, as in the instant case, there is no showing that defendant was at or near the scene of the crime. While the defendant in *Flores* was placed in the victim's car the next day, it was not until almost four months after the crime that head hairs which bore the same characteristics as deceased's were found in a pickup appellant sold about two weeks after Price's murder. While the testimony of Dr. Randall regarding the results of the tests he performed on known head hairs of the deceased and the hairs found in the pickup reflected that the odds were extremely high that the hairs came from the same person, it was undisputed that the vehicle defendant was driving in *Flores* belonged to the victim. In *Flores*, clothing and personal items of the deceased were placed in the defendant's possession. In the instant case, clothing and personal effects of the victim were recovered but appellant was not shown to have ever been in possession of same, nor was he shown to have been at or near the place where such items were recovered. In *Flores*, human bloodstains, though their origin was not shown, were found on the defendant's shirt and in the victim's car he was driving. No such showing is made in the instant case. In *Flores*, the victim's car had license plates affixed to it which were issued to another vehicle when the defendant was discovered driving same six weeks after the crime. In the instant case, there is no showing of such a deceptive circumstance. While appellant sold a pickup on April 28, approximately two weeks after the murder of the deceased, containing hairs which were later determined to have the same characteristics of those known to belong to the victim, appellant is not placed in the pickup on the date of the murder, nor does the record reflect that the accused owned such vehicle on the date in question. The results of the comparison of the plaster casts of tire tracks at the scene and two tires taken from the pickup sold by appellant are clearly inconclusive. The same is true of the comparison of track and wheel base measurements made at the scene and those taken of the pickup in question. The record contains evidence which reflects that a lug wrench was probably the murder weapon. Appellant was never placed in possession of same, nor was he shown to have been at or near the place it was discovered. The incident related by William Kump and the extraneous offense where Steven Laney was beaten, which was admitted by the court on the issue of identity, do not prove that appellant committed the crime. See *Brooks v. State*, 138 Tex.Cr.R. 526, 137 S.W.2d 768.

■ While all of the circumstances shown may very well amount to proof of strong suspicion or a probability that appellant committed the crime charged, the evidence does not exclude all other reasonable hypotheses except appellant's guilt.

For the failure of the evidence to meet the required burden of proof, the judgment is reversed and the cause remanded.

Opinion approved by the Court.