**Walter Henry ROUTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 61530.**

Court of Criminal Appeals of Texas, Panel No. 2.

Nov. 21, 1979.

Robert S. Thompson, San Antonio, court appointed, Antonio G. Cantu, San Antonio, of counsel, David K. Chapman, San Antonio, Janet M. Seymour, Houston, for appellant.

Bill M. White, Dist. Atty., Susan D. Reed and Douglas V. McNeel, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for involuntary manslaughter. After a bench trial the court assessed punishment at ten years.

In his first ground of error appellant contends the circumstantial evidence is insufficient to support the conviction. The indictment alleged that appellant did:

". . . intentionally and knowingly cause the death of ROSE MARIE McCORD by STRIKING AND BEATING THE SAID ROSE MARIE McCORD WITH HIS HAND AND AN OBJECT TO THE GRAND JURORS UNKNOWN . . ."

The deceased, a child of less than two years of age, was left in appellant's care on the night of November 11, 1977. In the early morning hours of November 12 emergency medical personnel and police were called to a report of an injured child at the apartment where appellant was in charge of the deceased and her several half brothers and sisters. She was dead at the scene. Appellant told the officers that the child had fallen down the stairs.

Dr. Nina Hollander testified to the cause of death:

"Q. Now, Doctor, were you able after having examined Rose Marie McCord to formulate an opinion as to her death?

"A. The child died from multiple injuries including fracture of the left humerous and laceration of the liver and the mesentery. Transection of the pancreas and duodenum and multiple contusions. And the matter was homicide.

"Q. Did you find any indication marks anywhere on the body to indicate how these would be inflicted?

"A. The injuries to the abdomen considering the contusions of the back and the front could have been inflicted by thumbs being pressed in the back and other fingers being pressed in the front of the abdomen with great force.

"Q. Would this be by both hands or one hand?

"A. Both hands.

"Q. For an arm of a child of this age to be broken, what sort of force is required?

"A. Well, it requires force—a bone is not that easily broken.

"Q. The lacerations and contusions that you have testified to, did you determine whether or not that they were made at one particular time?

"A. They were made within twenty-four hours of death of the child.

"Q. What I am asking is whether or not they were made—whether many of them were older than others?

"A. No, these weren't old contusions that were consistent with the occurrences having been made at the same time.

"Q. Let me ask you this: If a child had fallen down stairs, would these contusions and lacerations and injuries would have been consistent with that sort of an accident?

"A. No, would not account for all of them."

The only witness to testify to appellant's treatment of the deceased was her half-sister, seven year old Doris Moody:

"Q. Do you remember about the Police Officers coming?

"A. Yes.

"Q. Do you remember whether Walter was there?

"A. (Nodding head affirmatively)

"Q. Was your mother home?

"A. No.

"Q. How long had Walter been there?

"A. (No response)

"Q. Was he living there with you?

"A. (Nodding head negatively)

"Q. Was he supposed to take care of you that night?

"A. (Nodding head affirmatively)

"Q. He was?

"A. Yes.

"Q. Did you see Walter try to change Rosie's diaper?

"A. (Nodding head affirmatively)

"Q. You did?

"A. Yes.

"Q. And, did you see what happened—what was Rosie doing when Walter was trying to change her diaper?

"A. She was laying on the floor.

"Q. Okay. Was she making any noises?

"A. Crying.

"Q. What was she doing?

"A. Crying.

"Q. What room was she in when she was lying on the floor?

"A. Jeannie's.

"Q. Jeannie's?

"A. Yes.

"Q. And, is that upstairs or downstairs?

"A. Upstairs.

"Q. Okay. Now, when Rosie was crying, what did Walter do?

"A. Spanked—shaked her.

"Q. Okay. Did you see Rosie's arm?

"A. (Nodding head affirmatively)

"Q. Did you ever see Rosie's arm get red?

"A. (Nodding head affirmatively)

"Q. And, why did it get red?

"A. Because Walter was shaking her.

"Q. Okay. What was he using to shake her?

"A. With his hands.

"Q. Okay. Was Rosie crying a lot while all of this was happening?

"A. (Nodding head affirmatively)

"Q. She was, is that right?

"A. Yes.

*   *   *   *   *   *

"Q. Now, when you didn't go downstairs and you just stood there, could you see Walter?

"A. Yes.

"Q. From where you were standing?

"A. (Nodding head affirmatively)

"Q. What was he doing?

"A. Leaning over Rosie to get the wet rag.

"Q. Okay. And, what was he doing to Rosie?

"A. Shaking her.

"Q. Okay. Now, how was he doing that?

"A. Like this. (Indicating)

"Q. What was he using?

"A. His hands.

"Q. Okay. What did you do after you saw this? Did you stay there and watch?

"A. Yes.

"Q. How long did you stay there?

"A. For a minute.

"Q. After you stayed there for a minute, where did you go? Did you do anything?

"A. I went downstairs.

"Q. And then, what happened?

"A. Johnny brought cigarettes up to Walter.

*   *   *   *   *   *

"Q. And then what happened?

"A. Johnny talked a little bit.

"Q. Okay. And then what happened? Did Johnny stay there?

"A. No.

"Q. Did he leave?

"A. He talked for a little while and then he left.

"Q. Okay. And, what did you do?

"A. Lay on the couch.

"Q. Okay. Do you know what Walter did during that time?

"A. (Nodding head negatively)

"Q. Okay. Do you remember if the Police came later?

"A. (Nodding head affirmatively)

"Q. Was it that same night?

"A. (Nodding head affirmatively)"

On cross-examination she testified:

"Q. Well, I am a little mixed up and you are going to have to help me to get straightened out. When Johnny left, was Rosie downstairs or upstairs?

"A. Who?

"Q. When Johnny left, was Rosie upstairs or downstairs?

"A. Downstairs.

"Q. And Walter had already brought her downstairs?

"A. (Nodding head affirmatively)

"Q. Did Johnny see Rosie upstairs?

"A. No.

"Q. Had Rosie already been brought downstairs when Johnny came?

"A. Yes, and then Johnny left and he did not come back.

"Q. I see. Was Walter upstairs when Johnny came?

"A. No.

"Q. He was downstairs?

"A. No—yes.

"Q. You were downstairs when Johnny came?

"A. Yes.

"Q. Was there anybody downstairs when Johnny came?

"A. No.

"Q. Did Johnny go upstairs?

"A. No.

"Q. He did not go upstairs?

"A. No.

"Q. So everybody stayed downstairs?

"A. No—yes. And then he left.

"Q. Did he see Rosie when he came?

"A. (Nodding negatively)

"Q. I see. Did Rosie ever go back upstairs after Johnny left?

"A. No."

On redirect she testified:

"Q. I just have one question for you: That night when all of this happened, do you remember if Rosie fell down the stairs?

"A. No.

"Q. She didn't?

"A. Yes, she did.

"Q. When?

"A. After Johnny brought the cigarettes.

"Q. Did you see how she fell down the stairs?

"A. (Nodding head negatively)

"Q. Where was Walter when this happened?

"A. Upstairs.

"Q. How far did she fall?

"A. (Nodding head negatively)

"Q. You don't know? Was it one step or two steps?

"A. (Nodding head negatively)

"Q. Did you see this happen?

"A. No.

"Q. How do you know it happened?

"A. I think she fell down four or five.

"Q. You actually saw her fall down four or five stairs?

"A. No.

"Q. Did Walter tell you that she fell down the stairs?

"A. No, I heard it."

The most significant points of Dr. Hollander's testimony are: (1) that the deceased's abdominal injuries, considering the contusions in back and in front, could have been caused by thumbs being pressed in back and the other fingers being pressed in front with great force by both hands, (2) that the injuries were inflicted within 24 hours of death, and (3) that a fall down the stairs would not account for *all* the injuries.

The most significant points of Doris' testimony were (1) that appellant was taking care of the children that night although he did not live there, (2) that when he was changing the small child's diaper, she was crying, and Doris saw him shake her using his hands, and (3) that she heard the child fall down the stairs.

Of significance in the combined import of these witnesses' testimony is that while the

injuries could have been inflicted at any time within 24 hours of death, it was also shown that appellant did not live at the apartment, but was only there to care for the children that night, and there was no showing of when appellant took charge of the children, or of whether the deceased had no injuries at that time. Although the testimony shows that the abdominal injuries could have been caused by great force being applied by the hands, and that appellant shook the child, no testimony was presented of how he held the child, or whether he grasped it in a manner consistent with the severe abdominal injuries it received. This is a weak circumstantial evidence case because of the deficiencies in the description by Doris Moody of appellant's actions, because of the testimony of Dr. Hollander that the injuries were inflicted within twenty-four hours of death coupled with the fact that it was not shown when appellant, who did not live in the apartment, had charge of the children, and because of the State's failure to call as a witness the mother of the deceased who had left the children in appellant's care and presumably could have shown when appellant took charge of the children on that night and what the condition of the dead child was at that time.[1]

In *Waldon v. State*, 579 S.W.2d 499, the Court held:

"It is also well established that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting only to a strong suspicion or mere probability is insufficient. *Stogsdill v. State*, Tex.Cr. App., 552 S.W.2d 481; *Flores v. State*, Tex.Cr.App., 551 S.W.2d 364; *Easley v. State*, Tex.Cr.App., 529 S.W.2d 522; *Indo v. State*, Tex.Cr.App., 502 S.W.2d 166. This is especially significant when the

night watchman was in the terminal area with a view of the runway and plane parking area and could have shed light on the missing facts of this case.

"Where circumstantial evidence relied on by the prosecution is somewhat weak and where the record on appeal affirmatively shows not only that other testimony which would have cast additional light on the facts was available to the prosecution, but also that the prosecution did not introduce such other evidence or satisfactorily account for its failure to do so, the appellant court will treat the case as one showing reasonable doubt of the sufficiency of the evidence to support the conviction. *Schershel v. State*, Tex.Cr.App., 575 S.W.2d 548; *King v. State*, Tex.Cr. App., 396 S.W.2d 409; 24 Tex.Jur.2d 427, Evidence, Section 745."

This rule applies to the instant case. The failure of the State to produce or explain the failure to produce the mother of the deceased child, who presumably could have testified to the time appellant took charge of the child, the condition of the child at that time, and the treatment of the child during the earlier part of the twenty-four hours during which the fatal injuries were inflicted, raises a reasonable doubt as a matter of law under the rule quoted above from *Waldon v. State*.

The evidence being insufficient, the conviction is set aside and the judgment is reformed to show an acquittal. See *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15.

---

1. The State also asserts that the evidence of appellant's statement at the scene that the child fell down the stairs constituted proof of fabrication. Although Doctor Hollander testified that not *all* of the child's injuries could have been caused by such a fall (implying that some of them may have been so caused), Doris Moody testified on examination by the State that the child did fall down the stairs. The evidence on this matter does not significantly strengthen the State's case.