**Feryl John GRANGER, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 13–81–188–CR.**

Court of Appeals of Texas, Corpus Christi.

Feb. 24, 1983.

Logen L. Foster, Foster, Pope & Orsak, Sugar Land, for appellant.

Wm. Meitzen, Dist. Atty., Richmond, for appellee.

Before NYE, C.J., and UTTER and GONZALEZ, JJ.

## OPINION

GONZALEZ, Justice.

This is an appeal from a conviction for murder. Trial was before a jury which found appellant guilty and assessed punishment at life in the Texas Department of Corrections. The dispositive issue is whether the trial court erred in allowing the prior testimony of a State's witness to be used against appellant where it was shown that the testimony had been obtained as the result of an undisclosed "understanding" between the State and the witness whereby the witness' death sentence was reduced to imprisonment for 50 years. We hold that the non-disclosure prevented an effective cross-examination of the witness at the prior trial and rendered the former testimony inadmissible. We therefore reverse and remand for a new trial.

### THE EVIDENCE

The issues in this case require a thorough review of the events culminating in appellant's conviction. Appellant, John Feryl Granger, was originally indicted along with Mary Lou Anderson for the capital murder of Anderson's father and stepmother. *Anderson was tried first for the capital murder of her father, found guilty, and sentenced to death.*

After she was found guilty and while her motion for new trial was pending, the State brought appellant to trial for capital murder. The State's primary witness was appellant's accomplice. She testified that in December, 1977, she was having financial problems and had concocted several blackmail schemes to improve her financial situation. Through a third party, Anderson contacted the appellant and they worked out an arrangement whereby the appellant would act as the collector in her various blackmail schemes.

She testified further that on January 2, 1978, appellant came to her apartment in LaFayette, Louisiana, and informed her that he was going to kill her parents. She had previously told appellant that she was the beneficiary on a life insurance policy on her father. According to Anderson, appellant then stated that she was to assist in the killing or the appellant would kill her son. She accompanied appellant to the apartment of Darold Comeaux where they borrowed a car and obtained a .25 caliber

automatic pistol. Anderson further testified that with her son being held hostage in Louisiana, she and the appellant drove from LaFayette to Beaumont, where they spent the night in a motel. The following morning, the two stopped at a Gibson's Department store in Beaumont, where she bought a box of .25 caliber ammunition and the appellant browsed at pistols. The appellant then went to the prescription counter and purchased some adhesive tape. They then left Beaumont for Sugarland, but had a flat tire on the way. Anderson remembered that someone in a pickup truck took them to a nearby service station. After purchasing a new tire, the two proceeded on to the Sugarland area. Shortly after arriving in Sugarland, appellant stopped and told Anderson to put out the license plate lightbulb. She testified that appellant then tied her up with rope and put her in the back seat of the car. Appellant told her that if she said anything or tried to get loose, he would have her and her son killed. Appellant slipped on some gloves and loaded his pistol. The two then drove to her parents' house. It was already dark when they arrived shortly after 6:00 p.m. Appellant parked about two houses down from the Anderson home, went inside her father's residence and stayed ten to fifteen minutes. When appellant came out of the house, his gloves were bloody and he had a "wild-eyed look."

According to Anderson, as they left Sugarland, she remembered passing a police car while they were driving the wrong way on a one-way street. She further testified that on the way back to Louisiana she threw the excess ammunition out of the car window. Appellant stopped and threw the gun and the gloves out of the car. Various other witnesses testified and after all the evidence was presented, the jury found appellant guilty of capital murder. He was sentenced to death.

*Shortly after this trial, Mary Lou Anderson was granted a new trial, pled guilty to the offense of murder, and her sentence was reduced to 50 years in the Texas Department of Corrections.*

Following this, the appellant's capital murder conviction was reversed by the Court of Criminal Appeals because the non-accomplice testimony failed to sufficiently corroborate the element of remuneration which, under the circumstances, was necessary to sustain a conviction for capital murder. The court held that the appellant could be retried for the lesser included offense of murder. *Granger v. State,* 605 S.W.2d 602 (Tex.Cr.App.1980). The State then indicted appellant for murder. On retrial, the State called Mary Lou Anderson to testify against appellant, and offered her immunity from any further charges connected with the murder of her parents. She refused to testify and was held in contempt. The State was then allowed to introduce and read into evidence a written transcript of the testimony that Anderson had given at appellant's capital murder trial.

At the second trial, the State also called several other witnesses. Darold Comeaux testified that on January 2, 1978, the appellant and Anderson came to his apartment and borrowed his Monte Carlo with Louisiana plates, and a .25 caliber semi-automatic pistol. Comeaux testified that when appellant returned the car it had a new tire.

An employee of Gibson's testified that on January 3, 1978, she sold a box of .25 ammunition to Mary Lou Anderson. Anderson was required to sign her name and show identification. The employee testified that she saw the appellant looking at pistols.

Another Gibson employee testified that she sold some adhesive tape to the appellant on January 3, 1978.

The owner of a service station outside Winnie, Texas, stated that he sold a tire to appellant on January 3, 1978.

John Claussen, a police officer in Sugarland testified that on January 3, 1978, shortly after dark, he passed a Monte Carlo with Louisiana plates going the wrong way on a one-way street. The location where he saw this car was just a few blocks from the Anderson home. A few minutes later he was flagged down by Joan Maresh, Marjorie Anderson's daughter, who took him to

the murder scene. Claussen also testified that he found .25 caliber casings in the Anderson home and an empty spool of adhesive tape in Anderson's back yard. He also testified that the Andersons were bound and gagged with adhesive tape.

Dr. Joseph Jachimeczyk, a forensic pathologist, testified that he removed three .25 caliber bullets from the body of Steve Anderson and that Anderson died as the result of the gunshot wounds. He also stated that the mouth and wrists were bound with adhesive tape. Marjorie Anderson also received multiple gunshot wounds which were the cause of her death.

Joan Maresh testified that she telephoned her mother (victim) between 5:00 and 6:00 p.m. They made arrangements for Maresh to drop by later that evening. Maresh found the bodies of Steve and Marjorie Anderson shortly after 6:30 p.m.

Officer L.J. Bertrand of the Louisiana State Police testified that he located a Monte Carlo with the same tire purchased in Winnie on January 3, 1978. Bertrand found a live .25 caliber round in the car.

## SUFFICIENCY OF THE EVIDENCE

Initially we will address appellant's contentions that the evidence is insufficient to sustain the conviction. Even with the accomplice testimony, this is a circumstantial evidence case. It is well settled that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused. *Stogsdill v. State,* 552 S.W.2d 481 (Tex.Cr. App.1977). It is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State,* 551 S.W.2d 364 (Tex.Cr.App.1977). We find the evidence sufficient to sustain the conviction.

Appellant, however, also argues that accomplice testimony of Mary Lou Anderson is not sufficiently corroborated to satisfy the requirements of Art. 38.14 Tex. Code Crim.Pro.Ann. (Vernon 1965). We disagree. In determining whether accomplice testimony is sufficiently corroborated, all the facts and circumstances may be looked to as furnishing the corroboration necessary. The corroborative evidence may be circumstantial or direct. Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense satisfies the test. Each case must be considered on its own facts and circumstances and on its own merits. *Paulus v. State,* 633 S.W.2d 827 (Tex.Cr.App. 1982). Viewing the evidence in the light most favorable to the jury's verdict, as we are required to do, we find that the evidence from non-accomplice testimony tends to connect the appellant with the crime charged and is sufficient to corroborate the accomplice witness' testimony. Appellant's grounds of error two and six are overruled.

## ADMISSIBILITY OF FORMER TESTIMONY

In his first ground of error, appellant contends that the trial court erred in allowing into evidence the prior testimony of Mary Lou Anderson, in violation of the Confrontation Clause of the United States Constitution and Article I, Section 10 of the Texas Constitution. While Texas Courts have not previously addressed whether prior testimony is admissible where a witness refused to testify on retrial, the general rule in other jurisdictions is that the State may introduce the prior testimony when a witness refuses to testify or is incapable of testifying even though present in court. See: *State v. Thomas,* 110 Ariz. 120, 515 P.2d 865 (1973); *People v. Rojas,* 15 Cal.3d 540, 125 Cal.Rptr. 357, 542 P.2d 229 (1975); *Bridges v. State,* 26 Ala.App. 1, 152 So. 51, cert. den. 292 U.S. 633, 54 S.Ct. 718, 78

L.Ed. 1487 (Ala.1933); *Exleton v. State,* 300 Okl.Cr.App. 224, 235 P. 627 (Okl.1925); *State v. Terry,* 202 Kan. 599, 451 P.2d 211 (Kan.1969); *People v. Pickett,* 339 Mich. 294, 63 N.W.2d 681 (Mich.1954).

The appellant argues that in enacting Art. 39.01 Tex.Code Crim.Pro.Ann. (Vernon 1979), the legislature addressed the issue of the unavailability of a witness and articulated certain specific instances where prior testimony could be admitted in a subsequent trial. Appellant notes that a witness' refusal to testify is not one of the circumstances articulated in that statute.

It is the opinion of one commentator, however, that "(w)here previous testimony taken upon a plenary trial is offered in a criminal case, this statute (Art. 39.01) would be inapplicable, and under the general statute (Art. 38.01), presumably the common law rules as to the admission of such evidence would apply." 1A R. Ray, Texas Law of Evidence, § 944 (Texas Practice 3rd ed. 1980).

As such, there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement. *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). To meet constitutional muster, however, it must be shown that (a) the witness was unavailable and (b) the accused had the opportunity to effectively cross-examine the witness at the prior proceeding. *Barber,* supra., *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Whether or not the provisions of Art. 39.01 apply to testimony given at plenary trials, we hold that as a general rule the State is allowed to introduce the testimony of a witness given at a prior trial where the witness refuses to testify at the later proceeding. We note that the State in this case made a good-faith effort to obtain the testimony of Mary Lou Anderson. The State called her as a witness and attempted to get her to testify. She said that her attorney had advised her not to testify and that she would follow his advice. The State offered her immunity, and after she still refused to testify, the trial court held her in contempt. Under these circumstances, it is obvious that the State could not obtain her testimony even though Anderson was present in court. In effect, she was "unavailable" to testify, and this is a bona fide reason for the admission of the former testimony.

Our analysis, however, does not end with a determination that the witness was unavailable. Before it can be said that the appellant's constitutional right to confront the witness was not infringed, the adequacy of the examination of the witness at the first trial must be taken into consideration. *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

As noted above, at the time of appellant's first trial, Mary Lou Anderson had been found guilty of capital murder and sentenced to death, but a motion for new trial was pending. Anderson was the State's primary witness and testified extensively about appellant's involvement in the deaths of her father and step-mother. *Out of the presence of the jury at the first trial, Anderson testified that she had no expectation that the State and her lawyers would work out a deal where she would be removed from death row and sentenced to some term of years.* She claimed to be testifying "because Feryl killed my parents and I just felt like I should tell my part." She denied having been told by one of her attorneys that all she had to do was trust the prosecutor and he would work something out if she testified. *In the presence of the jury, appellant cross-examined Anderson extensively about her motives for testifying and the substance of her story. Anderson again denied that her testimony was motivated by an "understanding" or "agreement" whereby the State would act to remove the death*

*penalty hanging over her. The State made no effort to show that any "understanding" or "arrangement" for her testimony had been made which would reduce the pending death sentence. She also denied that there were any discussions with the State to plea bargain away the death sentence.* However, within ten days of appellant's capital murder conviction, Anderson was granted a new trial, allowed to plead guilty to murder, and her sentence was reduced to 50 years.

On retrial, the appellant developed evidence which shows that when appellant was first tried for capital murder *there was an understanding between the State and Anderson's attorney that she would receive favorable treatment in exchange for her testimony.* Much of this testimony was received outside the presence of the jury, including a letter written by the judge of the trial court which convicted Mary Lou Anderson of capital murder. It reads as follows:

"November 1, 1978

Dear Jurors:

You must have heard that Mary Lou Anderson was granted a new trial, plead (sic) guilty to murder and received a fifty year sentence. I am sure your service on the jury in August was difficult in view of the decision you reached and you deserve an explanation of why the subsequent decisions were made.

In the companion case, The State of Texas vs. Feryl John Granger, the State had two possibilities of proof connecting Granger with the murders. About two weeks before the trial, one was removed when the Louisiana witness disappeared. That left only Mary Lou Anderson's testimony. The prosecution discussed the matter with me, explained they had to have her testimony and wanted my approval on a lessor sentence in the event she agreed to testify.

In view of the unlikelyhood (sic) of a woman ever being executed, the considerable cost to the taxpayers of appeals and the certainty that a man who executed two innocent people would walk free, I

consented. Mary Lou Anderson was offered no "deal" but there was a tacid (sic) understanding with her lawyers and fifty years was the State's recommendation.

Had you not done what you did, Feryl John Granger would be back in Louisiana instead of having been brought to justice. I hope you understand what you did enabled the State to prove it's case against a wanton and coldblooded executioner.

Very truly yours,
/S/Neil Caldwell
Neil Caldwell
Judge of the 23rd District Court
Wharton County, Texas"

Although Judge Caldwell was not called on to testify, Lester Van Slyke, one of Anderson's defense attorneys, was called by the appellant. Outside the presence of the jury, Van Slyke testified that while Anderson had been personally offered no deal, she "had my assurance that to trust me and to go ahead and testify," because he had an "understanding" with Jack Salyer, the District Attorney, *that if Anderson testified she would get something similar to what the State offered her before trial, which was a sentence of 35 to 50 years.* According to Van Slyke, he met with Salyer before appellant's capital murder trial and Salyer said that he couldn't make a deal, but "to trust him or something like that." Salyer's statement to "trust me" came immediately after Van Slyke had asked him to make a forty or fifty year offer. Van Slyke reiterated that while there was "no deal" as such, *there was an "understanding" that Anderson's sentence would be reduced from death to forty or fifty years.*

Jack Salyer, the lead prosecutor in the appellant's former trial, was called by appellant. Outside the presence of the jury he admitted talking to Lester Van Slyke about obtaining Anderson's testimony at Granger's capital murder trial. Salyer said that in his opinion the State could not have obtained a conviction without Anderson's testimony and that getting Anderson to testify was very important. While maintaining that there was no deal for Ander-

son's testimony, Jack Salyer testified as follows:

"Q Did you tell him (Lester Van Slyke) that you thought it would be to her advantage to testify?

A I know I told him it couldn't hurt her, she couldn't be in any worse shape than she was in.

Q And he had ... you had told him before that you needed her testimony and you would offer her fifty years and you wouldn't ... you even went down to thirty-five, the best you remember?

A I think I did; other people tell me I did not.

\* \* \* \* \* \*

Q Last Wednesday night or Thursday night, one night last week, you and I and Mr. Foster discussed this particular matter, did we not?

A Yes, sir.

Q And you told ... you told us that basically you had a ... had some kind of an understanding, didn't you, with Van Slyke?

A We talked about a lot of things and I won't mention some of them, *but I think I told you I did have an understanding with Van Slyke, that I felt something was going to be done; as far as the term of years, we did not have that.*[1]

Q I understand and I believe you told me last week ya'll never discussed a particular term of years, that he was justified from the way you understood it, with your ... from your conversation with him and basically with Mary Lou that he ... she would get something akin or around what she had been offered?

A I couldn't say that, no. I think he was justified in thinking something beneficial would happen to his client which would be something less than death. Fifty years and life are almost identifical (sic), sixty and life are identical, so I think he would be justified in feeling that, yeah, from all the whole picture and

what have you, all the conversations in Wharton and Bay City, yes.

Q If she testified?

A Yeah.

Q That it would probably not happen if she did not testify or she would be left to what other avenue she might have?

A Well, if she didn't testify, all they would do is ship her back to T.D.C."

Later on in his testimony, Salyer reiterated that Van Slyke would have been justified in believing that a deal would be worked out after Anderson testified. He adamantly maintained, however, that no "deal" had been worked out prior to appellant's capital murder trial. Following the introduction of Anderson's former testimony and in the presence of the jury, William Meitzen, the second State's attorney in appellant's capital murder trial, testified that he neither recommended or objected to Anderson receiving a new trial and having her punishment reduced to 50 years.

The appellant then called Lester Van Slyke, who briefly testified that while there was "no deal" for Anderson's testimony, he did have a feeling that she would receive forty to fifty years in exchange for her testimony. The crux of his testimony was: *"I'm sure I told her that I talked to Jack (Salyer) and that I felt certain she was going to have the death penalty pulled off her in exchange for her testimony and she wanted to know what type of offer he had given me. I'm sure she asked that and I'm sure I told her he had given me no exact definite number of years, but that he told me to trust him and don't worry about it and I told her the same thing, that I felt certain she would be somewhat pleased with it."*

■ It is the appellant's contention that because the "understanding" between the State and the witness was not divulged at the appellant's capital murder trial, the appellant was deprived of his right to effectively cross-examine Anderson about her motives for testifying against the appellant.

---

1. Merriam-Webster Collegiate Dictionary (150th ed. 1981) defines "understanding" as:

"... a mutual agreement not formally entered into but in some degree binding on each side."

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court said the following:

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.... A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). *We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) 415 U.S. at 317 [94 S.Ct. at 1110]." (emphasis ours)

Where an agreement or understanding has been made between a witness and the State for testimony, the jury has a right to know about it to judge the credibility of the witness. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

 In *Burkhalter v. State,* 493 S.W.2d 214 (Tex.Cr.App.1973), cert. den. 414 U.S. 1000, 94 S.Ct. 354, 38 L.Ed.2d 236, it was held that where the witness did not directly have an agreement with the State, reversible error existed where the jury was not informed that the witness' lawyer had an "understanding" with the State but only told the witness that his testimony "could help him."

In the present case, while it appears that the "understanding" was not the result of direct contact between the State and Anderson, the record does show that the State's attorney conveyed to Anderson's counsel his intention to reduce the death penalty in exchange for Anderson's testimony. In turn, Anderson's counsel relayed this information to her.

By whatever description, "deal," "arrangement," or "tacit understanding," the fact is that the State agreed to reward Mary Lou Anderson for her testimony by reducing her death sentence to a term of years. This was known to the presiding judge, the prosecutor, the defense attorney and Anderson. Yet Anderson was allowed to mislead the jury by denying that this played any part in her motivation to testify against the appellant. Whether it was or wasn't is not the point. The point is that the jury was entitled to know this so they could give this factor as much weight as they thought it merited in judging Anderson's credibility.

Although cross-examined about her motives, Anderson did not equivocate. As such, counsel for appellant was unable to develop the extent of any deal between the State and Anderson. Furthermore, in allowing Anderson to testify that no deal or expectation existed, the State recklessly mislead the jury about Anderson's motives and prevented an effective cross-examination of Anderson.

This situation brings the case within the rules announced in *Burkhalter,* supra, and *Giglio,* supra. As such, we find that the non-disclosure of the arrangements made between the State and the witness Anderson deprived appellant of his right to effective cross-examination.

 We also note that where the State is aware that an arrangement for testimony has been made, the failure to disclose the arrangement generally deprives the jury of the opportunity to judge the witness' credibility and results in a denial of

due process. *Burkhalter,* supra. The State may not knowingly use false evidence, including false testimony, to obtain a conviction. *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This rule does not cease to apply merely because the false testimony goes only to the credibility of the witness. *Burkhalter,* supra. As recognized in the above cited cases, the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. When the witness, with the State's acquiescence, allows the factfinder to believe that the testimony is motivated by reasons other than self-interest, the basis for judging credibility is tainted. This is "constitutional error of the first magnitude and no amount of showing of want of prejudice will cure it." *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App.1975).

The dissent argues that the error in admitting Anderson's prior testimony was cured in the second trial because that jury knew that Anderson was in fact given a new trial and sentenced to 50 years shortly after her testimony was given. For several reasons, we do not think the error can be cured by merely informing the second jury that the incriminating testimony was obtained as the result of an arrangement between the State and the witness.

First, we are not convinced that the second jury ever understood the full extent of the arrangement between the State and Anderson. Upon reviewing the record, we find that the second jury knew Anderson's sentence was reduced. We cannot say, however, that they knew it was the result of an agreement with the State. Before the jury were Anderson's former testimony that there was no deal, and her counsel's present testimony that there was an "understanding" that her sentence was going to be reduced. The jury was unaware of Judge Caldwell's letter and of Jack Salyer's testimony that some "understanding" had been reached. At best, the jury had before it conflicting evidence on whether the State and the witness reached an "understanding" prior to the appellant's capital murder trial.

Assuming arguendo, that the second jury did believe that an "understanding" had prompted the Anderson testimony, we remain unconvinced that this could to any extent remedy the ineffective cross-examination at the former trial. The effect of the nondisclosure lives on because the State relies on the same testimony to obtain its conviction. We acknowledge that Anderson's credibility as a witness is seriously damaged if the second jury believed that a deal existed and Anderson's testimony indicated just the opposite. If this be the case, the State is asking us to condone a conviction based on admittedly incredible evidence. We do not choose to do so. Appellant's first ground of error is sustained.

■ In his fourth ground of error, appellant argues that his retrial violated his constitutional rights against double jeopardy. We disagree. Where a conviction has been reversed on appeal because the evidence is insufficient to prove the aggravating elements of capital murder, retrial on the lesser included offense is permitted. *Cruz v. State,* 629 S.W.2d 852 (Tex.App.—Corpus Christi 1982, pet. ref'd). Moreover, the Court of Criminal Appeals has already indicated that appellant could be retried for the lesser included offense of murder. *Granger, supra.* Appellant's fourth ground of error is overruled.

In sustaining the appellant's first ground of error and finding the evidence sufficient to support the conviction, we hold that appellant may be retried for the offense of murder.

The judgment of the trial court is REVERSED and REMANDED.

NYE, Chief Justice, dissenting.

I respectfully dissent. The majority opinion bases the disposition of the case on alleged error in admitting the former testimony of co-defendant Anderson who, after testifying at appellant's first trial, refused to do so at the retrial. I fully agree that it was error to allow Anderson to testify against the appellant in the first trial without disclosing to the jury the existence of

the understanding by which Anderson was to receive favorable treatment in her own case in exchange for her testimony against appellant. However, I am not convinced that such error was reversible in the context of the second trial.

The second jury was apprised of the fact that Anderson's sentence was reduced from death to fifty years' confinement shortly after appellant's first trial. They heard testimony that there was in fact an agreement, however vague and indefinite, to reward Anderson for her testimony by obtaining for her a lesser punishment than she had originally received for her part in the crime. The able cross-examination of Anderson by appellant's counsel at the first trial included vigorous questioning concerning the possibility of a deal with the State's counsel. Hearing that portion of Anderson's former testimony certainly must have made the jury aware that there was an issue as to Anderson's credibility. I would hold that the second jury was not deprived of the opportunity to judge the credibility of the witness for themselves.

Once the jury in the second trial came to possess the knowledge necessary to determine whether Anderson may have been motivated to testify falsely in favor of the State, any error in the admission of her former testimony was cured or rendered harmless. See *Burkhalter v. State,* 493 S.W.2d 214, 220 (Tex.Cr.App.1973) (dissenting opinion); *United States v. Blackwood,* 456 F.2d 526, 530 (2d Cir.1972). There being no reversible error, I would affirm the judgment of the trial court.