UNITED STATES of America,
Appellee,

v.

Robert BLACKWOOD and Tobias Cohen,
Appellants.

Nos. 556, 557, Dockets 71–1925, 71–1952.

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1972.

Decided March 1, 1972.

John S. Martin, Jr., New York City (Segal & Hundley, New York City, on the brief), for appellant Tobias Cohen.

Wesley R. Asinof, Atlanta, Ga. (Asinof, Smith & Eberhardt, Atlanta, Ga., on the brief), for appellant Robert Blackwood.

John J. Kenney, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., John W. Nields, Jr., Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Robert Blackwood and Tobias Cohen were convicted by a jury before Judge Constance Baker Motley of transporting

in interstate and foreign commerce securities of a value of more than $5,000, knowing the same to have been stolen, 18 U.S.C. § 2314, and of conspiracy to do so, 18 U.S.C. § 371. They were sentenced to concurrent terms of five years on each of the five counts of the indictment. On appeal, they challenge the admissibility of certain evidence and the propriety of restrictions placed on their cross-examination of the key government witness. We affirm.

The evidence presented at trial established that in August 1967, Oliver Coleman, an Atlanta mortgage-broker, was approached in New York City by Fred Seely, an acquaintance of his, and Tobias Cohen, and asked if he "could handle the sale of stocks listed on the New York Stock Exchange." Coleman's response was that he could not, but that Robert Blackwood, his Atlanta attorney, "had his own security company and would be in a position to" dispose of the stock. Some six weeks later, Coleman in Atlanta received telephone calls from Seely and Cohen telling him to come to New York to pick up the securities for delivery to Blackwood in Atlanta. Coleman traveled to New York and on October 12 received a sealed manila envelope containing several hundred shares of stock of the Coca Cola Bottling Company, Northwest Airlines, and of the General Electric Company, issued to Francis I. duPont & Co. and bearing duPont's machine stamp endorsements. The envelope was taken by Coleman to Atlanta and there delivered to Blackwood, who on the following day went to Nassau, British West Indies, where the stock was sold through use of a numbered account for approximately $67,550. After deducting his fee, Blackwood deposited the proceeds in a sealed manila envelope, which Coleman carried to Cohen and Seely in New York.

On his return trip from New York, Coleman carried an even bigger load—almost $300,000 worth of securities of such companies as IBM, General Electric, Polaroid, Republic Steel and Texaco—for delivery to Blackwood. Soon after receiving this package, Blackwood flew to Zurich, Switzerland, opened a numbered bank account, and deposited the stock for sale. A week later, after a brokerage house employee's observation that the certificates did not bear a tax stamp had precipitated an investigation, it was discovered that both batches of securities sold by Blackwood had been stolen from F. I. duPont & Company.

The chief government witness against the appellants was Coleman, who had pleaded guilty to one count of the indictment a few days before the trial was to begin. Coleman testified at length and in detail to his meetings with Cohen and Seely in New York and with Blackwood in Atlanta, and to his role as courier between New York and Atlanta. The defense case relied almost entirely on the testimony of the appellants. Cohen contended that his meetings with Seely and Coleman had been for a legitimate business purpose having nothing to do with the sale of securities, while Blackwood conceded that he had engaged in the sale of the stolen securities in Nassau and Zurich but denied any knowledge that the securities had been stolen.

Appellant Blackwood's first argument concerns Judge Motley's denial without a hearing of his motion to suppress certain evidence. Blackwood testified on his own behalf that he was unfamiliar with certain types of securities transactions, and that he had received only a small portion of the proceeds from the sale of the first group of stocks. In an effort to impeach him, the government offered in evidence the transcript of a tape-recorded conversation in which Blackwood demonstrated his knowledgeability in the area of stocks and bonds, and in which he discussed the methods by which tainted stock could be sold outside the country to minimize the possibility of tracing. In addition, the government offered a portion of Blackwood's office notebook which indicated that he had received a substantially larger bite of the monies raised by the first sale of stolen stock than he had originally admitted. At trial Blackwood

sought for the first time to suppress both items, claiming that they had been illegally seized from his ex-wife in 1967 pursuant to a defective search warrant. Judge Motley ruled the motion untimely, however, relying on F.R.Cr.P. 41(e), which states that such motions to suppress "shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing."

▆▆▆ We agree that Blackwood's motion to suppress was not timely made, and there is no suggestion that he was unaware until trial either of the occurrence of the search or the government's intention to use the fruits thereof. Moreover, the evidence, even if illegally seized, would still have been admissible for the limited purpose of impeachment. Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954); cf. Harris v. New York, 401 U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

The appellants' second ground for reversal relates to Judge Motley's refusal to allow Coleman to be recalled for further cross-examination. On Coleman's direct examination, the government elicited that Coleman had pleaded guilty to one of the substantive counts of the indictment but had not yet been sentenced, a procedure we have permitted on the ground that to defer the introduction of such evidence as to the witness' motivation to favor the government until it is brought out on cross-examination by the defendant might give the jury the unjustified impression that the government was concealing this relevant fact. United States v. Del Purgatorio, 411 F. 2d 84, 87 (2d Cir. 1969). We have held that any possible prejudice to the defendant arising out of the jury's treating the witness' guilty plea as probative of the defendant's guilt can be obviated by appropriate limiting instructions by the trial court, 411 F.2d at 87. See also United States v. Silverman, 430 F.2d 106, 125 (2d Cir. 1970), cert. denied, 402

U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 rehearing denied, 403 U.S. 924, 91 S.Ct. 2227, 29 L.Ed.2d 704 (1971).

On cross-examination, Coleman admitted his hope that the court, in sentencing him, would give him consideration for his cooperation with the government, but testified that nothing along those lines had been promised. Soon after the cross-examination had been completed, Cohen learned that Blackwood was in possession of a tape recording of a conversation between Coleman and Blackwood which occurred during the period when the charges were pending, in which Coleman stated that (1) the Assistant U.S. Attorney said he would recommend a suspended sentence in return for cooperation, (2) he was not guilty although he had pleaded guilty, and (3) he had no idea that the securities were stolen. Although Coleman was present in court, Judge Motley refused to allow him to be recalled for further cross-examination about these statements, ruling that the alleged contradictions between his testimony and his conversation with Blackwood were of questionable relevancy and that, in any event, such impeachment should have been brought out on the initial cross-examination.

▆▆▆ We start with the proposition that a trial judge must be afforded wide latitude in management of the courtroom. "[I]n the last analysis the trial court is the governor of the trial with the duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. And we should not overrule the exercise of that discretion unless we are convinced that the ruling of the court was prejudicial." Foster v. United States, 282 F.2d 222, 224 (10th Cir. 1960); cf. United States v. Dibrizzi, 393 F.2d 642, 645 (2d Cir. 1968). As to the defendant Blackwood, our deference to the trial judge's discretion should be especially broad, since Blackwood has challenged a refusal to allow Coleman to be recalled without showing any valid reason for his failure to use the material then in his possession during his earlier cross-examination

of that witness. See Faust v. United States, 163 U.S. 452, 455, 16 S.Ct. 1112, 41 L.Ed. 224 (1896); Kuhn v. United States, 24 F.2d 910, 914 (9th Cir.), modified, 26 F.2d 463, cert. denied, Lee v. United States, 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533 (1928). Since Cohen, however, did not know of the existence of the tapes until Coleman's testimony had been concluded, and hence could not have used them as the basis for his earlier cross-examination, the trial judge's ruling as to him presents a closer question. We believe that the better practice would have been to allow Cohen to recall Coleman for the limited purpose of examining him with respect to his prior inconsistent statements, since it would have caused but a minor disruption of the trial and could conceivably have had some effect on the jury. However, even if Judge Motley's refusal to permit Coleman to be recalled rises to the level of an abuse of discretion, in our view the error was harmless.

■■■ Of the three subjects about which Coleman was claimed to have been inconsistent, we view the statement that he had been promised leniency by the Assistant U. S. Attorney as the most critical. A defendant's major weapon when faced with the inculpatory testimony of an accusing witness often is to discredit such testimony by proof of bias or motive to falsify. Evidence of such matters is never collateral, United States v. Lester, 248 F.2d 329, 334 (2d Cir. 1957); United States v. Haggett, 438 F.2d 396, 399 (2d Cir.), cert. denied, 402 U.S. 946, 91 S.Ct. 1638, 29 L.Ed.2d 115 (1971); McCormick on Evidence § 40 (1954), for if believed it colors every bit of testimony given by the witness whose motives are bared. The rule is that "[i]n attempting to establish the motives or bias of a witness against him, a defendant may  .  .  . elicit evidence showing that the government made explicit promises of leniency in return for cooperation." United States v. Campbell, 426 F.2d 547, 549 (2d Cir. 1970).

■■■ A defendant's right to elicit such evidence, however, is not boundless, but is subject to reasonable limitations imposed by the trial judge in the exercise of sound discretion. The test for determining whether there has been an abuse of discretion is whether "the jury was otherwise in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias." 426 F.2d at 550. We are satisfied that the circumstances from which the jury could decide whether Coleman might have been inclined to testify falsely in favor of the government were adequately presented to the jury in this case. Coleman testified to the fact that he had pleaded guilty, had not been sentenced, and was hoping for some consideration in return for his cooperation. In addition, the Assistant U.S. Attorney noted in his summation that Coleman had a motive to favor the government's contentions in this testimony:

> "Who has a motive to perjure himself here? Mr. Coleman, of course, has an interest, no doubt about that. He has been convicted on his plea of guilty. He has yet to be sentenced and he has a motive to be as great a help to the government in this case as he can, and he would hope that that sort of thing would be taken into account in the sentence."

Furthermore, Judge Motley's charge instructed the jury that "in weighing the testimony of government witnesses charged as co-conspirators in the indictment you may take into account any motive the witnesses may have in testifying for the government. The witness Coleman has pleaded guilty and has not yet been sentenced." Thus, we are not presented here with a case of almost complete preclusion of cross-examination as to a witness' motive for testifying, see United States v. Haggett, *supra*, 438 F.2d at 399–400; United States v. Padgent, 432 F.2d 701, 704–705 (2d Cir. 1970), nor of prosecutorial suppression of an offer of leniency, see United States v. Giglio, 405 U.S. 150, 92 S.Ct.

763, 31 L.Ed.2d 104 (Feb. 24, 1972). Rather we have a situation in which Coleman's obvious reason to cooperate with the government was noted in testimony, in summation, and in the judge's charge. In short, "the issue was fairly put to the jury," United States v. Mahler, 363 F.2d 673, 677 (2d Cir. 1966), and the refusal to allow the admission of Coleman's prior statement of a promise of leniency is not reversible error.

We likewise find no basis for reversal in the failure to permit Coleman to be recalled for the purpose of examining him with respect to his prior taped statements that he was not guilty although he had pleaded guilty and that he had no idea that the securities were stolen. A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral, i. e., as to those matters which are relevant to the issues in the case and could be independently proven. IIIA Wigmore on Evidence §§ 1020–23 (Chadbourn rev. 1970); McCormick on Evidence § 36 (1954); United States v. Munchak, 443 F.2d 531, 534 (2d Cir. 1971); United States v. Barash, 365 F. 2d 395, 401 (2d Cir. 1966). Coleman's guilt, or his knowledge of whether the securities he transported from New York to Atlanta were stolen, is irrelevant as a matter of law to the determination of Blackwood's or Cohen's guilt or knowledge of that fact,[1] United States v. Del Purgatorio, supra, 411 F. 2d at 87; United States v. Light, 394 F.2d 908, 911, 914 (2d Cir. 1968), and the trial judge properly instructed the jury that no inference of guilt as to these two defendants could be drawn from Coleman's guilty plea. Therefore, we hold that it was proper to refuse to allow these prior inconsistencies to be brought to the attention of the jury.

Notwithstanding the collateral nature of Coleman's lack of guilty knowledge, the trial judge had the discretionary power to permit Cohen the opportunity to impeach Coleman by eliciting prior inconsistent statements with respect to it. See United States v. Manton, 107 F.2d 834, 845 (2d Cir. 1939) (per Sutherland, J.), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). Such cross-examination might have served to minimize the risk that Coleman's guilty plea, notwithstanding the court's twice-given instructions to the contrary, would have a prejudicial rub-off effect on Cohen. However, we do not believe that the trial court's refusal to permit it amounted to an abuse of discretion. The suggestion that Coleman, despite his guilty plea, was an innocent man testifying falsely against his co-defendants in order to secure leniency appears rather far-fetched. Upon pleading guilty Coleman had expressly conceded his guilty knowledge. Moreover, despite the exculpatory statements later made by him to Blackwood—statements which strike us more as an attempt by Coleman to stay in his friend's good graces than as bona fide expressions of innocence—Coleman made no attempt to withdraw his guilty plea under F.R.Cr. P. 32(d) and proceeded instead to reassert his guilt in court. Furthermore, Cohen's own appraisal of the insignificance of this matter is demonstrated by his earlier failure to cross-examine Coleman at all as to his plea of guilty or his knowledge that the securities were stolen, even though he at that time had in his possession Coleman's testimony to the grand jury that he had "no idea under the sun that [the securities] would be stolen."[2]

The judgments of conviction are affirmed.

---

1. Furthermore, Coleman's role differed from that of Cohen and Blackwood. He was the messenger who carried the securities in sealed envelopes and not the person who procured the stolen stock (Cohen) or the attorney who sold it (Blackwood).

2. While this grand jury statement may have referred to an earlier point in time, we expect that Cohen's counsel would have pursued it to some extent at least had he thought the subject of Coleman's knowledge to be of significance.