UNITED STATES of America, Appellee,

v.

Leonard JAMES and Otto Sebold,
Appellants.

Nos. 710, 725, Dockets 78–1346, 78–1353.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1979.

Decided Sept. 6, 1979.

Rehearing and Rehearing En Banc
Denied Dec. 18, 1979.

John H. Doyle, III, New York City (Anderson, Russell, Kill & Olick, P. C., New York City, Randy Paar and Robert P. Reichman, New York City, of counsel), for appellant Leonard James.

Henry Putzel, III, New York City, for appellant Otto Sebold.

Rhea Kemble Neugarten, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. S. D. N. Y., Andrew N. Karlen, Special Asst. U. S. Atty., Richard D. Weinberg and Howard W. Goldstein, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before FRIENDLY, SMITH and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal by Leonard James and Otto Sebold from judgments of conviction entered after trial to a jury in the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge,* on conspiracy and substantive counts involving the making of false statements in connection with bank loans and securities fraud. We find no reversible error and therefore affirm the judgments.

A three-count indictment was filed on January 27, 1978 against James and Sebold, together with Peter Crosby, William Rubin and C. W. Deaton. Count One alleged that all five individuals engaged in a conspiracy to make false statements to banks for the purpose of obtaining loans and extensions of credit and renewals thereof, and to commit mail fraud, wire fraud and securities fraud, in violation of 18 U.S.C. § 371. Count Two charged James, Sebold, Deaton and Rubin with substantive offenses involving the making of false statements, in violation of 18 U.S.C. § 1014. Count Three charged James, Crosby, Deaton and Rubin with substantive securities fraud violations, in violation of 15 U.S.C. § 77q.

Prior to trial, the district court granted the government's motion to sever Rubin's trial from that of the other defendants. He

was tried in May, 1978 and convicted on Count One, but acquitted on Count Three. The government's motion to dismiss Count Two was granted when the jury was unable to reach a verdict. Rubin's conviction was affirmed on appeal. *United States v. Rubin*, 609 F.2d 51 (2d Cir. 1979). Deaton was not tried, because an earlier extradition order by which his presence in the United States had been obtained had not related to the events alleged in the indictment. The district court granted the government's application for an order *nolle prosequi* in March, 1978.

The trial of James, Sebold and Crosby began on May 31, 1978 and continued until June 29, 1978. The jury found James and Sebold guilty on Counts One and Two, acquitted James on Count Three and acquitted Crosby on both counts in which he had been named. The district court sentenced James to 18 months in prison. Sebold received a suspended sentence of one year in prison and was placed on probation for three years.

Since there is no challenge to the sufficiency of the evidence, we shall merely summarize the events which gave rise to this indictment and trial. The proof at trial tended to demonstrate that James, Rubin and Deaton engaged in a scheme to obtain financing fraudulently from the Bankers Trust Company ("Bankers Trust") for their company, Tri-State Energy, Inc. ("Tri-State"). Through their efforts, and with the assistance of Sebold, who was a mining engineer, Tri-State obtained short-term loans totaling $475,000 from Bankers Trust. The scheme involved the use of false reports regarding Tri-State's chief asset (a coal mine), fraudulent sales contracts with Roland Werkstatten, GmbH, a German corporation for which Sebold was an agent, misrepresentations that stock of various companies which was pledged as collateral was unrestricted, and cash payments to two loan officers of Bankers Trust, Raymond

Ludwig and John Keating. In addition, James, Rubin and Deaton painted a rosy, but false, picture of Tri-State's future in order to obtain extensions of some of the loans as they came due. All the outstanding loans eventually were consolidated into one note, payable on demand. The defendants continued to put off the day of reckoning by reassurances that Tri-State's business soon would improve. The scheme fell apart only when Bankers Trust received inquiries about Deaton and Tri-State from the Justice Department. The bank finally demanded full payment of the loans. When payment was not forthcoming, Bankers Trust commenced a lawsuit against Tri-State. Only about $2,500 was recovered.

The appellants allege numerous grounds for reversal of the judgments. Although we agree that some of the rulings attacked constitute error, we conclude that none of the errors, whether considered separately or cumulatively, requires reversal, and we therefore affirm.

Sebold testified in June, 1976 before the first grand jury [1] that investigated the events that led to his indictment. The attorney for the Strike Force on Organized Crime advised Sebold of his right to counsel and his right against self-incrimination. He further informed Sebold that the grand jury was "inquiring into possible violations of federal law on the part of Tri-State Energy and certain of its officers . . . ." Sebold was not an officer of Tri-State.

Sebold asserts that he was a target of the investigation at the time he testified. He contends that the failure to warn him that he was a target violated the rule established by this circuit in *United States v. Jacobs*, 531 F.2d 87 (2d Cir.) *("Jacobs I")*, *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, *original decision adhered to*, 547 F.2d 772 (2d Cir. 1976) *("Jacobs II")*, *cert. granted*, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977),

---

1. A grand jury heard testimony from nine witnesses in 1975 and two more in 1976. The investigation was suspended while the IRS and the Tax Division of the Justice Department decided whether to bring a criminal tax prosecution in the Southern District. By the time a tentative decision not to bring tax charges in the district was made, the original grand jury had expired. A new presentation was made to a second grand jury in January, 1978.

*cert. dismissed as improvidently granted,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53. (1978). Sebold concedes, however, that his trial counsel failed to object when the testimony was offered at trial.[2] Thus Sebold now is forced to argue that admission of the testimony was "plain error" that requires reversal despite the failure to object at trial.

We cannot agree. It is true that Rule 52(b), Fed.R.Crim.P., which simply restates the pre-existing law, *United States v. Del Llano,* 354 F.2d 844 (2d Cir. 1965), provides that "[P]lain error or defects *affecting substantial rights* may be noticed although they were not brought to the attention of the court." (Emphasis added.) It is clear, however, that the defect of which Sebold complains affected no rights that he possessed. The Supreme Court held in *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), that failure to advise a witness before a grand jury that he was a "potential defendant" did not violate any constitutional right and thus did not require suppression of the witness' testimony. Our decision in *Jacobs I* and *II* to suppress such testimony was intended as "a one-time sanction to encourage uniformity of practice (*whatever the practice might be*) between the Strike Force and the United States Attorney . . . ." *Jacobs II, supra,* 547 F.2d at 773. (Emphasis added.) The establishment of such uniformity performed the "important function of the administration of criminal justice to let our citizens know that equal justice is available to all . . . ." *Id.,* at 775. In addition, it might "bring the Strike Force and the United States Attorney to closer harmony, a boon for even-handed law enforcement which often will redound to the benefit of the prosecution rather than of the defense."

*Id.,* at 778. Thus *Jacobs* does not support the argument, rejected in any event by *Washington,* that the failure to give a "target warning" violated any right of a subsequently indicted defendant. We also find no reason again to exercise our supervisory powers to encourage uniformity. The Strike Force in the Southern District has been merged with the United States Attorney's Office since the events in question and the decision in *Jacobs I.*[3]

■ Sebold also contends that his prosecution was barred by the five-year statute of limitations provided in 18 U.S.C. § 3282. The indictment, which was filed on January 27, 1978, alleged that the conspiracy lasted from June, 1972 through June, 1973, and that the events involved in Count Two, the substantive false statements charge, occurred from January 30, 1973 through March, 1973. As to this latter count, Sebold argues that the government proceeded on the theory that he was liable for the substantive crimes of his co-conspirators. Sebold does not dispute that the evidence established his participation in the conspiracy. He contends, however, that his withdrawal from the conspiracy before January 27, 1973 barred prosecution on either count. We disagree.

Withdrawal from a conspiracy requires "affirmative action . . . to disavow or defeat the purpose," *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912), of the conspiracy. The burden of proof of withdrawal rests on the defendant. *United States v. Panebianco,* 543 F.2d 447 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977); *United States v. Borelli,* 336 F.2d 376 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The

---

2. Sebold's counsel on appeal suggests that trial counsel may have failed to object because he was from New Jersey and thus unaware of this court's decision in *Jacobs I.* We decline to engage in unsupported and irrelevant speculation that counsel who appear pro hac vice in this circuit fail to familiarize themselves with the decisions of its courts. In any case Sebold assumed that risk in hiring a lawyer from outside the circuit.

3. James also complains of the failure to advise Sebold that he was a target of the investigation. His contention must be rejected for the additional reason that he lacks standing to invoke Sebold's rights. *See Rakas v. Illinois,* 439 U.S. 128, 140 n.8, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

record here is totally devoid of any affirmative act by Sebold to disassociate himself from the conspiracy. It is not even clear when Sebold claims to have withdrawn. His brief makes reference to testimony that he went to Tri-State's offices in early February, 1973 and found the doors padlocked. Such action by Sebold, even if it could be viewed as suggesting an intention to withdraw from the conspiracy, falls far short of the "communication of the abandonment in a manner reasonably calculated to reach co-conspirators," required by *Borelli, supra,* 336 F.2d at 388. Furthermore, withdrawal in early February, 1973 would not bar prosecution for a conspiracy count filed in January, 1978.

Sebold's final contention is that the district court erroneously admitted testimony by Keating concerning a telephone conversation with a person who purported to be Sebold. The caller stated that he was acting as a representative of Roland Werkstatten. Sebold in fact was a representative of the company. The caller sought to obtain Bankers Trust's approval of language in a letter of credit which Roland Werkstatten was to obtain from a German bank to finance its purported purchases of coal from Tri-State, so that Bankers Trust would loan money to Tri-State on the strength of the German company's letter of credit.

■ Sebold's counsel objected at trial that both the substance of the conversation and the purported identity of the caller were inadmissible because the conversation was not properly authenticated.[4] The Assistant United States Attorney conceded that Keating did not know who the caller actually was. The court overruled the objection, without stating any reason. Keating made clear to the jury, in response to questions from the prosecutor, that he had "no idea" whether the caller was in fact Sebold and that he had not spoken to Sebold on any other occasion, before or after

the call. In her summation, the prosecutor emphasized to the jury that Keating could not say whether it was "Mayor Koch or Mr. Sebold on the phone." If the prosecutor had stopped there and the court had given an appropriate limiting instruction, Sebold's argument on appeal would present no problem. The substance of the conversation clearly was admissible against Sebold as a statement of a co-conspirator, *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), subject to subsequent proof, which was provided, of the existence of the conspiracy and of Sebold's participation in it. Regardless of the identity of the caller, it was apparent that the call was made in furtherance of the object of the conspiracy, the obtaining of the bank loans. This may have been the government's basis for offering the evidence, since it conceded that Keating did not know the caller's identity. However, the trial judge did not require the government to state the propounded basis for admissibility. More seriously, the court did not instruct the jury as to any limitation on the purpose for which the call might be considered. The prosecutor was left free to suggest in summation, as she subsequently did, that the caller might have been Sebold, because he had acknowledged talking to someone at the bank (although he insisted that the conversation had occurred in person and was with someone other than Keating or Ludwig) and had not remembered whether he might have talked to Keating by telephone.

The situation here thus is similar to that dealt with in *United States v. Zane,* 495 F.2d 683, 696–97 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). In *Zane,* the district court admitted on alternative theories evidence of two phone conversations received by a bank officer from a caller who purported to be one of the defendants. The court said that the jury might find on the basis of circumstan-

---

4. Although the court may have assumed at first that the objection was directed only to the identification of the caller, counsel made clear, just before being cut off by the court's ruling, that his objection went to the entire conversation:

COUNSEL: That's correct, but I think unless that proper foundation [of knowledge of the caller's identity] can be laid, the entire testimony will be—
·THE COURT: Overruled. Let's proceed.

tial evidence that the defendant made the calls, or it might find that the calls were made by a co-conspirator and thus were admissible as an act in furtherance of the conspiracy. On appeal, this court held that there would have been no error if the conversations had been admitted only on the second ground. However, the court concluded that the circumstantial evidence that the defendant himself had placed the calls was weak and that it was more likely that a co-conspirator was the caller. Thus it was error to submit the case on the alternative hypotheses. The error, however, was not sufficiently serious to warrant a new trial because there was ample independent proof of the conspiracy, the evidence clearly was admissible on the other theory, the trial court specifically noted to the jury that the officer could not identify the caller, the government did not argue that the defendant was the caller and there was substantial proof of the defendant's involvement in the conspiracy.

Here, as in *Zane*, some circumstantial evidence suggests that the caller was in fact the defendant. He accurately described Sebold's role as an agent of Roland Werkstatten and the arrangements which he was attempting to make for that company's purchases of coal from Tri-State. However, the other conspirators also were aware of Sebold's efforts, and, as the government's brief concedes, one of them could have placed the call in his name. The evidence was probably insufficient to allow the jury to speculate that Sebold was the caller, and therefore not admissible for the unlimited purposes for which the government later attempted, albeit half-heartedly, to use it.[5]

The ruling, although erroneous, nonetheless does not warrant reversal. There was substantial other evidence of Sebold's role in the conspiracy, particularly in connection with the proposed sales to Roland Werk-

statten. For example, Sebold admitted signing the name of Roland Werkstatten's president to a letter addressed to James, which purported to report progress in the resale of some of the coal covered by the fraudulent purchase orders. The letter also mentioned the letter of credit that was the subject of the telephone call to Keating. Sebold's contention that the conversation was the only evidence from which the jury could infer that he knew of or sought to further the fraud against the bank is contradicted by the record. Sebold testified that he knew that Tri-State was seeking financing. He conceded that he prepared numerous erroneous or fraudulent documents which could be used to obtain financing. His grand jury testimony, which was admitted as part of the government's case, acknowledged that the purchase orders could be used as "window dressing" in an application for a bank loan. Thus there was plentiful evidence from which the jury could infer that Sebold actively participated in defrauding Bankers Trust. The evidence provided by the telephone conversation was merely cumulative and affected no substantial rights of the appellant.

James' attack on his conviction[6] focuses on testimony given by Raymond Starns, an individual who was not indicted in this case but was named as a co-conspirator in a bill of particulars submitted by the government. Starns, who shared office space at Tri-State during part of 1972, gave considerable testimony that implicated James in Tri-State's fraudulent activities. He identified James and Deaton as "international money brokers or financiers" who were involved in multi-million dollar transactions. He testified that James was acquainted with Deaton during 1971 and early 1972, when Deaton was serving a sentence in federal prison on a fraud conviction. Starns reported James' familiarity with Tri-State's financial statements, including his

---

5. We do not suggest that there was anything improper about the government's summation. Once the district court failed to limit the use of the evidence, the Assistant U.S. Attorney was not prohibited from suggesting that the jury infer that Sebold actually was the caller.

6. As allowed by Fed.R.App.P. 28(i), Sebold adopts the arguments advanced by James, insofar as they are applicable to him.

knowledge that two $100,000 personal checks drawn by Starns without sufficient funds and held by Deaton were reflected in the October, 1972 statement. Rubin and Deaton gave this statement to Bankers Trust in support of Tri-State's financing application. Starns also placed James at a series of meetings during which Starns and Deaton insisted that certificates of stock of All States Life Insurance Company of Alabama should not bear any legend indicating that they were restricted. These shares later were pledged to Bankers Trust, which was assured by Rubin and Deaton that the stock was freely tradeable.

The trial transcript shows Starns to have been a quick-witted and, at times, entertaining witness. Unfortunately, Starns had, on several occasions in the past, put his engaging manner to use in ways which the law frowns upon. Thus, the government thought it advisable to elicit, in its direct examination, several facts of which defense counsel had knowledge and which could reflect adversely on Starns' credibility and his motive for testifying. Among these facts were: (1) Starns had been convicted in Louisiana in 1974 on eight counts involving possession of forged government checks. He was sentenced to seven years in prison, but, as a result of his cooperation with the government in the trial of a co-defendant, the sentence was reduced to time served (about two months) and Starns was placed on probation. (2) An injunction had been entered against Starns in connection with an SEC enforcement proceeding. (3) Starns had made no agreement with respect to his possible indictment in the Tri-State affair, but claimed that his understanding of the statute of limitations had led him to conclude that he faced little threat of indictment. (4) Starns was under federal indictment in North Carolina in connection with an alleged scheme to defraud that involved the issuance of millions of dollars of worthless bank instruments. This indictment was admitted into evidence. Starns acknowledged that he had testified before

the grand jury in North Carolina. He also stated that he hoped, but had "little expectation," that his testimony about Tri-State would help him in connection with the North Carolina prosecution.

James' counsel did not cross-examine Starns about the Tri-State matter, but sought to explore further the extent to which the pending indictment in North Carolina might provide him with a motive to testify against James. James now contends that the court erroneously restricted his cross-examination of Starns.

James argues first that Starns improperly was allowed to invoke selectively his privilege against self-incrimination. Before Starns took the stand, the government informed the court and defense counsel that Starns intended to assert his privilege as to any matter which might expose him to criminal liability, including the events involved in the North Carolina indictment. The defense argued that he should be barred from testifying under that restriction. The trial judge and counsel then conducted a voir dire examination of Starns, out of the jury's presence. Starns said that he had given extensive statements to the FBI and the North Carolina grand jury. He stated that he did not know whether he would plead guilty in that case.[7] The trial judge ruled that defense counsel would be allowed to inquire into Starns' "hopes and expectations" in testifying, but that he could invoke his privilege as to any collateral matters that involved only his credibility. The judge further ruled that Starns had not waived his privilege in this trial by making statements in North Carolina.

During cross-examination before the jury, Starns denied that his statements to the FBI amounted to confessions in the North Carolina case. He would not agree that there was "not the remotest possibility that [he could] escape conviction" in that case. But he declined to answer questions involving the contents of his statements to

7. A plea of not guilty was entered in North Carolina for Starns by his attorney while Starns was testifying in this case. This information was elicited during re-direct examination.

the FBI and whether he had signed a waiver of rights before talking to the FBI.

 James rightly does not challenge the district court's original ruling that Starns had not waived his privilege by making his previous statements to the FBI and the grand jury. A waiver of the privilege in one proceeding does not affect a witness' rights in another proceeding, *Ottomano v. United States*, 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Miranti*, 253 F.2d 135, 139–40 (2d Cir. 1958). Likewise, the ruling that Starns could invoke his privilege against questions involving collateral matters going only to his credibility was correct. *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). James insists, however, that Starns waived his privilege by selectively answering certain questions. We disagree. Although it is true, as James asserts, that "where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details," *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951) (footnote omitted), our examination of Starns' testimony shows that he disclosed nothing that might be characterized as incriminating. Therefore, he did not waive his privilege, which he properly invoked in response to other questions. *Id.; McCarthy v. Arndstein*, 262 U.S. 355, 359, 43 S.Ct. 562, 67 L.Ed. 1023 (1923).

James next argues that the district court improperly refused to admit copies of certain FBI reports and to allow testimony by an Assistant U.S. Attorney in North Carolina. The FBI reports contained statements made by Starns concerning the North Carolina case. The government attorney was called to testify as to whether Starns had been promised immunity from prosecution.

The question of the admissibility of the FBI reports again illustrates the importance of correctly specifying the basis claimed for admission of evidence. The re-

ports first were offered "as to [Starns'] credibility as a witness." The court sustained an objection to their admission and stated, "You can ask him about other misconduct, but you can't prove it by extrinsic evidence." This ruling accorded with the provisions of Fed.R.Evid. 608(b):

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.

James later asked the court to reconsider its decision. This time he offered the reports as relevant to Starns' motive for testifying. The judge adhered to her ruling that the reports described other misconduct that could not be proved by extrinsic evidence.

The admissibility of the North Carolina prosecutor's testimony also involves the application of Rule 608(b). During cross-examination, Starns testified that an Assistant U.S. Attorney in North Carolina, Rabideau Wilder, had told him, immediately prior to his appearance before the grand jury in 1976,[8] that he (Wilder) did not intend to prosecute Starns. At the conclusion of Starns' testimony, James' counsel represented to the court that Wilder, if called to the witness stand, would testify that he never promised Starns that he would not be indicted. The following colloquy ensued:

> Ms. Neugarten [Asst. U.S. Attorney]: That you can bring out, correct?
>
> Court: You can bring out on the defense case.
>
> Mr. Doyle [Counsel for James]: Yes. That is a specific application that your Honor would permit that.
>
> Court: All right.

Shortly thereafter, the court again stated: "You can bring up this prosecutor and show that this man is not telling the truth."

After the government rested its case, James sought to call Wilder to testify. The government, however, reversed its previous position and objected that the proffered testimony was barred by Rule 608(b)'s pro-

---

**8.** Starns testified that his grand jury appearance occurred in 1977, but there appears to be no dispute that the events actually took place in 1976.

**46**

hibition of extrinsic proof of specific instances of conduct for the purpose of attacking a witness' credibility. The government argued that "since it goes to whether Mr. Starns was telling a truth or not a truth as to something regarding North Carolina rather than something regarding Tri-State [, the testimony] falls within that exception for extrinsic evidence."[9] The judge then reversed her earlier ruling and agreed that Rule 608(b) barred Wilder's testimony. After further discussion with counsel, the court added, as a second reason for excluding the testimony, that it was not necessary or crucial for the defense because it was obvious from Starns' testimony that he had been indicted and was hoping for lenient treatment.

■■■ The district court erred in concluding that Rule 608(b) applied to either the FBI reports or Wilder's testimony. Although the language of the rule is unfortunately rather awkward, the Notes of the Advisory Committee show that it was intended to regulate only the use of specific instances of conduct to prove that the witness is a "bad person" or is a generally untruthful person who should not be believed. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[01], [05] (1978). However, "bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely." *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976). *Accord*, *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir.), *cert. denied* 409 U.S. 863, 93

S.Ct. 154, 34 L.Ed.2d 110 (1972); *United States v. Lester*, 248 F.2d 329, 334 (2d Cir. 1957).

The strength of the case against Starns in North Carolina, if known by him,[10] could bear upon Starns' motive to testify in this case. The stronger the case against Starns, and the more likely he was to be convicted, the stronger would be his motive to cooperate with the government in the hope of receiving more lenient treatment should he ultimately be convicted in North Carolina. Since Starns' statements to the FBI presumably would be used against him at trial, they were relevant to his motive to testify here. The district court therefore erred in ruling that the reports were merely inadmissible, extrinsic evidence of other misconduct.[11]

Wilder's testimony also was not excluded by Rule 608(b). "[W]hen attempting to show bias or interest, as opposed to bad reputation, the examiner is not bound to accept the witness' answer, but is free to call additional witnesses for impeachment." *Moynahan v. Manson*, 419 F.Supp. 1139, 1143 (D.Conn.1976), *aff'd mem.*, 559 F.2d 1204 (2d Cir.) *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977). Wilder's testimony was being offered to show, not that Starns had lied and therefore should not be believed, but that Starns had never been promised immunity and that he therefore had a motive to falsify testimony in this particular case.

9. The prosecutor also noted that she found herself in the position, which she desired to avoid, of potentially setting up a defense for Starns in North Carolina. If Wilder testified, it would be nominally in the government's interest in this case to cross-examine him to establish that he did promise not to prosecute Starns. Starns might then, however, try to challenge the North Carolina indictment on the ground that his grand jury testimony was induced by the false promise. The prosecutor therefore told the court, "Under that circumstance it is wise for me to bring 608(b) to your Honor's attention and ask this proof be excluded."

Although we see the prosecutor's dilemma, we are unable to discern its relevance to the admissibility of the reports, which we conclude were not covered by Rule 608(b).

10. *Cf. United States v. Campbell*, 426 F.2d 547, 549 (2d Cir. 1970) (actions evincing government's intention to trade leniency for cooperation are relevant only if witness knew of them).

11. The judge might have chosen to exclude the reports pursuant to Fed.R.Evid. 403, which permits the court to exclude relevant evidence if its probative value is substantially outweighed by, *inter alia*, danger of confusion of the issues or considerations of undue delay, waste of time or needless presentation of cumulative evidence. Admission of the reports might have bogged down the court in a "mini-trial" of the North Carolina case.

 Our conclusion that Rule 608(b) did not bar this evidence does not, however, mandate reversal. The exclusion of some evidence relevant to motive may not require reversal of a conviction. The test is whether the jury is in possession of sufficient information to make a discriminating appraisal of the witness' possible motives for testifying falsely in favor of the government. *United States v. Turcotte,* 515 F.2d 145, 151 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. Miles,* 480 F.2d 1215, 1217 (2d Cir. 1973) (per curiam); *United States v. Blackwood, supra,* 456 F.2d at 530; *United States v. Campbell,* 426 F.2d 547 (2d Cir. 1970).

Here, as in *United States v. Blackwood, supra,* 456 F.2d at 530, although it would have been preferable to allow the testimony, "[w]e are satisfied that the circumstances from which the jury could decide whether [the witness] might have been inclined to testify falsely in favor of the government were adequately presented to the jury . . . .." The jury knew that Starns was under indictment in North Carolina. It had in its possession the indictment that set forth the charges against him. The jury knew that Starns had not been indicted in this case, despite his involvement in at least some aspects of the scheme. Finally, and perhaps most importantly, the jury was aware that Starns had cooperated with the government in another case four years ear-

lier and had been rewarded with a substantial reduction of his sentence on a previous conviction. Although Starns insisted that he expected to be acquitted in North Carolina,[12] he also conceded that he hoped his testimony in this case would help him in his dealings with the government. All these factors, which defense counsel argued vigorously in summation, put the jury on notice of the compelling reasons that Starns had for testifying for the government. In addition, Judge Motley carefully instructed the jury that it could consider "any motives the witnesses may have in testifying for the Government."[13]

This case is unlike *United States v. Harvey, supra,* 547 F.2d 720 cited by James, in which the district court refused to admit extrinsic evidence that the government's sole identification witness had once accused the defendant of fathering and then failing to support her child. This court noted that "it is rarely proper to cut off *completely* a probative inquiry that bears on a feasible defense," *id.,* at 723 (emphasis added), and reversed the conviction because "appellant was denied an important opportunity to raise a reasonable doubt about his participation in the [crime]." *Id.* James' contention that the exclusion of extrinsic proof of Starns' motive "completely foreclosed defendant from introducing any meaningful proof on these critical areas and permitted Starns to perpetrate a fraud on the jury" is simply unsupported by the record. To the

---

**12.** Starns in fact was acquitted of all charges contained in the North Carolina indictment after a jury trial in January, 1979.

**13.** The judge instructed the jury as follows:

You are instructed that when you are weighing the testimony of witnesses who have testified for the Government in this case you may take into account any motives the witnesses may have in testifying for the Government. The fact that a witness may have a motive for testifying for the Government does not disqualify the testimony of that witness, but it may well affect the weight you give his testimony in adjudging the guilt or innocence of a defendant.

For example, (1) a witness may fear being prosecuted by the Government in this case; (2) a witness may hope for leniency in a related case in which he had pleaded guilty to

a related crime; (3) a witness may be awaiting trial in another jurisdiction on unrelated charges and may hope that by cooperating with the Government in this case his cooperation here will be made known to the Government and the Judge in that unrelated case; or (4) a witness may actually have been a co-conspirator in this case but has not been named as such but has testified for the Government, or he may be a person who could have been but who has not been indicted in this case. It may be that such witnesses hope that by testifying for the Government they will not be indicted in this or some other case, or it may be that they agreed to testify in exchange for not being indicted, or it may be that they have testified in exchange for an agreement to notify the sentencing Judge of such cooperation.

contrary, James was given "full opportunity to bring out just what favors the witness has already received from the government and what further ones he may be expecting." *United States v. Campbell, supra*, 426 F.2d at 554 (Friendly, J., dissenting).

James further suggests that, although the jury knew that Starns had an incentive at the time of trial to testify for the government, the exclusion of Wilder's testimony left the jury with the impression that he had no such motive to falsify when he began to cooperate with the government in May, 1978 before he was indicted in North Carolina. The government, however, did not even suggest such a theory to the jury. In fact, the prosecutor conceded in her summation that Starns had "every motive in the world to help the Government." She then attempted to convince the jury that, despite his motives to falsify, Starns had given truthful testimony. In light of the overwhelming evidence going to motive, and the natural skepticism with which the jury could be expected to receive Starns' explanation of his cooperation,[14] we conclude that exclusion of Wilder's testimony was not error, certainly not reversible error.

James, in his final point relating to Starns' testimony, argues that the transcript of Starns' grand jury testimony in North Carolina should have been turned over to the defendants, as material covered by the Jencks Act, 18 U.S.C. § 3500.[15] He contends that the testimony was Jencks material because Starns testified on direct examination that he had appeared before and been indicted by the North Carolina grand jury and because it allegedly would have contradicted his statement on cross-examination that he had been promised immunity from prosecution.

Before Starns testified, the government disclosed to the defendants and the court that it had requested a copy of the transcript from the North Carolina prosecutor, that the prosecutor had applied to the chief judge of the Western District of North Carolina for an order releasing the transcript, as allowed by Rule 6(e) of the Federal Rules of Criminal Procedure, and that the judge had rejected the application as well as a suggestion that he transmit the transcript directly to Judge Motley. Judge Motley's subsequent efforts to make contact with the North Carolina judge were unsuccessful. Thus the court was left with the government's assertion, based on the representations of the North Carolina prosecutor, that Starns' grand jury testimony did not relate to the Tri-State matter or any persons involved therein.

Since the conclusion of the trial (and apparently upon the completion of the North Carolina trial), the government obtained a copy of the transcript, which the parties agreed to include as part of the record on appeal. As the government represented at trial, Starns' grand jury testimony did not deal with any of the events involving Tri-State to which he testified on direct examination. His mere mention of his grand jury appearance is not a sufficient basis to conclude that the transcript "relate[d] to the subject matter as to which [he] testified." 18 U.S.C. § 3500(b). *See United States v. Pacelli*, 491 F.2d 1108, 1120 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). However, this court has held that a statement may "relate," within the meaning of § 3500(b), not only to the witness' factual narrative, but also to impeachment of his direct testimony by showing

---

**14.** Starns contended that his original cooperation had nothing to do with the North Carolina case, but instead resulted from a decision by him, his wife and his mother that they "were tired of living the past few years leading the type of life I had been leading."

We do not doubt the possibility that a convicted criminal can reform himself, but merely recognize that a self-serving declaration of rehabilitation is unlikely to win unquestioning acceptance from a jury.

**15.** 18 U.S.C. § 3500 provides, in relevant part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter described) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

bias and interest. *United States v. Birn-baum,* 337 F.2d 490, 497–98 (2d Cir. 1964); *United States v. Borelli, supra,* 336 F.2d 376.

The transcript might have been admissible to show interest or motive through the strength of the case against Starns. But as our earlier discussion of the FBI reports indicates, there is not "a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Hilton,* 521 F.2d 164, 166 (2d Cir. 1975), *cert. denied,* 425 U.S. 939, 96 S.Ct. 1674, 48 L.Ed.2d 181 (1976).[16] The same conclusion applies to use of the transcript to demonstrate that Wilder had not promised Starns that he would not be indicted.[17] Although such an inference might be drawn from the transcript, Wilder's own testimony would have been as or more probative, and we already have held its exclusion to have been harmless.

■ James' attack upon the procedure followed by the government in presenting the case to the grand jury is without merit. He complains that there was excessive and unnecessary use of hearsay and that the grand jury was pressured into voting an indictment without adequate consideration because of the impending expiration of the limitations period.

We have dismissed indictments in the exercise of our supervisory powers because of improper use of hearsay testimony, *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972), although generally "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence," *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). In this case, unlike *Estepa,* the prosecutor clearly informed the grand jury that much of the evidence presented to it was hearsay, in the form of transcripts of testimony before the earlier grand jury.[18] The prosecutor also told the grand jury that it could have the witnesses brought before it to testify, if it so desired. In addition, substantial non-hearsay testimony was given by Keating, one of the bank loan officers. Finally, Judge Motley questioned the Assistant U.S. Attorney and the grand jury foreman to determine whether improper time constraints affected the grand jury's actions. We see no reason to reverse her decision not to dismiss the indictment.

■ James next contends that it was prejudicial error to admit into evidence a portion of Keating's 1978 grand jury testimony. Keating testified on direct examination that James had told him on February 26, 1973 that Tri-State was experiencing difficulties in repaying its loans because of a strike at its coal mines. On cross-examination, Keating conceded that he had not mentioned this conversation in his 1975 grand jury testimony. The government then offered Keating's 1978 grand jury testimony, in which he spoke of the February 26 conversation, to rebut the implied charge that Keating had recently fabricated the testimony.[19]

A prior consistent statement made prior to the time that an alleged motive to falsify arose may now be used, not only for rehabilitation, as under our earlier cases, *e. g.,*

---

**16.** Although the government's failure to disclose might better be characterized as "unavoidable" rather than "inadvertent," we believe this to be the appropriate test to determine whether a new trial is required. James has not suggested and the record does not indicate that the government deliberately suppressed the material.

**17.** Since Starns testified to this alleged promise during the cross-examination, it might be argued that impeachment in this regard would not relate to Starns' direct testimony. But if we assume, as we do, that possible use of the transcript to show the strength of the North Carolina case brought the material within § 3500, it is appropriate to consider in determining whether a new trial is required, whatever use defense counsel then could have made of the transcript under the rules of evidence.

**18.** *See* note 2, *supra.*

**19.** On redirect examination, Keating also testified that he had not been asked about the coal strike conversation during his 1975 grand jury appearance.

*United States v. DiLorenzo*, 429 F.2d 216, 220 (2d Cir. 1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971), but, by virtue of Federal Rule of Evidence 801(d)(1)(B), as affirmative evidence.[20] The problem presented here is to determine what was the alleged motive to fabricate. James, who agrees that he was charging Keating with recent fabrication, argues on appeal that the motive for fabrication was Keating's desire not to upset the agreement with the government whereby he would not be prosecuted. This motive, James insists, already existed at the time of Keating's 1978 grand jury testimony. James' argument, however, proves too much. Keating testified in both 1975 and 1978 under the same oral agreement, which was reduced to writing after the second grand jury appearance. The motive to which James points therefore existed even before the 1975 testimony and cannot be the factor that would have caused Keating to fabricate testimony between 1975 and the time of the trial. *Cf. United States v. Grunewald*, 233 F.2d 556, 566 (2d Cir. 1956), *rev'd on other grounds*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (theoretical possibility that a motive to falsify may have existed when prior statement was made is insufficient to form basis for rejection of evidence).

One aspect of the agreement, to which James' counsel specifically directed Keating's attention during cross-examination, did provide a motive for Keating to fabricate testimony against James. This was the requirement that Keating cooperate at future trials, with the government to be the sole judge of whether his testimony was truthful. While Keating had no motive, during his grand jury testimony, to implicate James in particular, once James was brought to trial, such a motive did exist. Thus his grand jury testimony was admissible as a prior consistent statement made before the motive arose. *Cf. United States v. Lombardi*, 550 F.2d 827 (2d Cir. 1977) (per curiam) (motive to obtain conviction of defendant did not exist when witness testified at co-defendant's earlier trial because defendant had not yet been apprehended).

██ James' remaining contentions require little discussion. The government was not required to accept James' offer to stipulate that a handwriting expert called by the government would testify that certain items were written by James. The government generally may refuse an offer to stipulate to facts and instead may offer its proof, *United States v. Brinklow*, 560 F.2d 1003, 1006 (10th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978), at least where the probative value of the evidence offered is not substantially outweighed by the danger of unfair prejudice. *United States v. Cockerham*, 155 U.S.App.D.C. 97, 100, 476 F.2d 542, 545 (D.C.Cir.1973) (per curiam). No such substantial danger existed here.

██ James complains of the district court's refusal to order the government to conduct an "all-agency search"[21] to deter-

---

**20.** We need not decide whether Fed.R.Evid. 801(d)(1)(B) should be construed to limit the use of prior consistent statements for the purpose of rehabilitation to those circumstances in which such statements also may be used as direct evidence. *Compare United States v. Rubin*, 609 F.2d 51 (2d Cir. 1979) (Friendly, *J.*, concurring), *with United States v. Quinto*, 582 F.2d 224, 232–34 (2d Cir. 1978). The government offered Keating's 1978 grand jury testimony directly in response to the inference of recent fabrication of his direct testimony:

MS. NEUGARTEN: Your Honor, I believe that the rule is that if there is a suggestion or inference of a recent fabrication, that the prior consistent statement can be proved.
THE COURT: Yes.
MS. NEUGARTEN: The government contends that the question addressed to the 1975 grand jury created the inference of a recent fabrication.

We conclude, *infra* at 50, that the statement thus qualified for admission both as direct evidence under Rule 801(d)(1)(B) and for rehabilitation under our earlier cases.

In any event, neither the parties nor the trial judge sought to limit the jury's use of the 1978 grand jury testimony to the issue of rehabilitation. If the jury was to be allowed to consider the testimony as direct proof of the coal strike conversation, the requirements of Rule 801(d)(1)(B) would have to be satisfied.

**21.** James suggests that such a search should involve a review of the records of eight agencies: the FBI, Internal Revenue Service, Postal Service, Bureau of Customs, Central Intelli-

mine whether he or his premises had been the subject of illegal electronic surveillance. James moved for such an order under the authority of 18 U.S.C. § 3504, which provides:

> (a) In any trial, hearing or other proceeding . . .

> (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act . . .

Although it has been said that a claim that illegal surveillance occurred need not be particularized, *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), it is now established that it cannot be based on mere suspicion but must have at least a "colorable basis" before the government will be obliged to respond. *United States v. Yanagita*, 552 F.2d 940, 943 (2d Cir. 1977); *In re Millow*, 529 F.2d 770 (2d Cir. 1976). James set forth no basis for suspecting the existence of such surveillance other than a conclusory allegation that the participation of the Strike Force in the investigation made such an event more likely than not. This allegation was insufficient to call for an all-agency search.[22] James' attempt to distinguish *Yanagita* and *Millow* because those cases involved grand jury witnesses rather than a defendant at trial finds no support either in the plain language of the statute, which makes no such distinction, or in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), cited by appellant.

We have examined the portions of the government's summation and the court's instructions to the jury that James has challenged and find no error.

We therefore affirm the judgments.

gence Agency, Department of Labor, Department of Defense and Department of State.

**22.** We need not determine whether it was necessary for the government to file a response, as it did, which stated that no one who partici-

pated in the investigation knew of any electronic surveillance of any of the defendants. Such a response, even if not required, was appropriate and is to be encouraged.